**TRAVELERS CASUALTY AND SURETY COMPANY as Administrator for Reliance Insurance Company, Plaintiff,**

v.

**DORMITORY AUTHORITY–STATE OF NEW YORK, TDX Construction Corp., and Kohn Pedersen Fox Associates, P.C., Defendants.**

**Dormitory Authority of the State of New York and TDX Construction Corp., Third–Party Plaintiffs,**

v.

**Trataros Construction, Inc., Third–Party Defendant.**

**Trataros Construction, Inc. and Travelers Casualty and Surety Company, Fourth–Party Plaintiffs,**

v.

**Carolina Casualty Insurance Company; Bartec Industries, Inc.; Dayton Superior Specialty Chemical Corp. a/k/a Dayton Superior Corporation; Specialty Construction Brands, Inc. t/a Tec; Kemper Casualty Insurance Company d/b/a Kemper Insurance Company; Great American Insurance Company; National Union Fire Insurance Company of Pittsburgh, PA.; United States Fire Insurance Company; North American Specialty Insurance Company; Allied World Assurance Company (U.S.) Inc. f/k/a Commercial Underwriters Insurance Company; Zurich American Insurance Company d/b/a Zurich Insurance Company; Ohio Casualty Insur-**

ance Company d/b/a Ohio Casualty Group; Harleysville Mutual Insurance Company (a/k/a Harleysville Insurance Company); John Does 1–20; and XYZ Corps. 1–19, Fourth–Party Defendants.

Kohn Pedersen Fox Associates, P.C.,
Third–Party Plaintiff,

v.

Weidlinger Associates Consulting Engineers, P.C.; Castro–Blanco Piscioneri and Associates, Architects, P.C.; Arquitectonica New York, P.C.; Cosentini Associates, Inc.; Cermak, Peterka Petersen, Inc.; Jordan Panel Systems Corp.; Trataros Construction, Inc.; and LBL Skysystems (U.S.A.), Inc., Third–Party Defendants.

Master File No. 07 Civ. 6915(DLC).

United States District Court,
S.D. New York.

Aug. 26, 2010.

JoAnne M. Bonacci, Eli J. Rogers, Dreifuss Bonacci & Parker, LLP, Florham Park, NJ, for Travelers Casualty and Surety Company and Trataros Construction, Inc.

Stephen B. Shapiro, Timothy B. Froessel, Holland & Knight LLP, New York, NY, for Dormitory Authority of the State of New York.

Robert Mark Wasko, Kaufman Dolowich Voluck & Gonzo, LLP, New York, NY, for Carolina Casualty Insurance Company.

## OPINION & ORDER

DENISE COTE, District Judge:

### TABLE OF CONTENTS

BACKGROUND ........................................................ 51

I. The DASNY–Trataros Contracts ............................... 51

II. Delays on the Project ....................................... 53

PROCEDURAL HISTORY ............................................. 54

DISCUSSION ......................................................... 55

I. Travelers' Claims Against DASNY ............................ 57

 A. Trataros' Impact Claim ................................. 57
 1. No–Damages–for–Delay Clauses Under New York Law ... 57
 2. The Applicability of *Corinno* Exceptions ......... 59
 3. Waiver of No–Damages–for–Delay Clause ............. 66
 B. Subcontractors' Pass–Through Claims .................... 69
 1. Crocetti's Impact Claims .......................... 71
 2. Jordan Panel's Extra Work Claim ................... 73
 3. Remaining Subcontractors' Impact Claims ........... 76
 C. Travelers' Bond Losses Claim ........................... 79

II. DASNY's Counterclaims Against Travelers .................... 80
 A. DASNY's Breach–of–Contract Counterclaim ............... 80
 B. DASNY's Performance Bond Counterclaim ................. 83
 C. DASNY's Payment Bond Counterclaim ..................... 85
 1. Payment Bonds Under New York Law .................. 85
 2. General Principles of Obligee Standing ............ 87
 3. Obligee Standing Under New York Law ............... 87
 4. Application ....................................... 88

CONCLUSION ........................................................ 91

This complex litigation arises out of the construction of a 785,000 square-foot vertical campus for Baruch College ("Baruch"), part of the City University of New York ("CUNY"), between about 1998 and 2002 (the "Project").[1] Plaintiff Travelers Casualty & Surety Company ("Travelers")—the surety to a prime contractor for the Project, Trataros Construction, Inc. ("Trataros")—has brought suit against the Project's "Owner," the Dormitory Authority—State of New York ("DASNY"),[2] asserting various claims arising out of Trataros' performance of its two prime contracts. DASNY, in turn, asserts counterclaims against Travelers for breach of those prime contracts and breach of two sets of surety bonds administered by Travelers.

On February 19, 2010, both parties filed motions for summary judgment. For the following reasons, Travelers' motion is granted in part, and DASNY's motion is granted in its entirety.

## BACKGROUND

The instant litigation has already been the subject of numerous Opinions by this Court.[3] Familiarity with all prior proceedings is assumed, and only the facts relevant to the two pending motions are outlined herein. These facts, taken from the parties' evidentiary submissions, are undisputed unless otherwise noted.

### I. The DASNY–Trataros Contracts

As Owner of the Project, DASNY entered into some thirteen prime contracts for carrying out the substance of the Project's construction work.[4] Trataros was eventually awarded two of these prime contracts, known as "Contract 15" and "Contract 16" (jointly, the "Contracts"). Contracts 15 and 16 were among the last

---

1. The completed building, known as the William and Anita Newman Vertical Campus, occupies approximately three-quarters of the city block bounded by East 24th and East 25th Streets and Lexington and Third Avenues in Manhattan. The building consists of fourteen above-ground stories, which principally house academic classrooms and offices, and three below-ground stories, which include an athletic complex and performing arts center.

2. DASNY gives its official name as "Dormitory Authority of the State of New York." DASNY is a public-benefit corporation organized under the Public Authorities Law of the State of New York. *See* N.Y. Pub. Auth. Law §§ 1675 *et seq.*

3. Most recently, the Court issued two Opinions deciding other sets of summary judgment motions. *See Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 734 F.Supp.2d 368, No. 07 Civ. 6915(DLC), 2010 WL 3199861 (S.D.N.Y. Aug. 11, 2010) (the *"August 11 Opinion"*), and *Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 732 F.Supp.2d 347, No. 07 Civ.

6915(DLC), 2010 WL 3001729 (S.D.N.Y. July 30, 2010) (the *"July 30 Opinion"*).

4. The Project fell within the terms of the New York Wicks Law, which requires, *inter alia*, that all public construction projects costing more than a certain monetary threshold must provide for "separate and independent bidding" for three types of work: plumbing and gas fitting; heating, ventilating, and air conditioning; and electric writing and fixtures. N.Y. State Fin. Law § 135; N.Y. Gen. Mun. Law § 101. The Project's thirteen prime contracts included the three Wicks Law work categories; the two "general trades" contracts awarded to Trataros; and specialized contracts for site excavation and foundation, structural steel, structural concrete, masonry, ductwork, sprinkler system/standpiping, fire alarm system, and temperature control. DASNY also entered into an architectural and design services contract with Kohn Pedersen Fox Associates, P.C. ("KPF") and a series of three contracts with TDX Construction Corp. ("TDX") for construction management services. DASNY's contracts with KPF and TDX are addressed in detail in the *August 11 Opinion*, 734 F.Supp.2d at 370–73, 2010 WL 3199861, at *1–*2.

prime contracts put out to bid and awarded by DASNY on the Project.

Trataros submitted its bid for Contract 15 on or about March 19, 1998. Trataros' bid of $50,222,000 was accepted on April 22 of that year, and Contract 15 was executed between DASNY and Trataros on or about April 27. The scope of work under Contract 15 included construction of the Project's windows, exterior curtainwall, exterior metal siding, elevators, rough carpentry, and ceilings.

Contract 16, in turn, included the interior fitout/curtainwall, roofing installation, flooring installation and finishing, swimming pool, acoustical spray, and miscellaneous metal work. Trataros' bid of $24,140,000 was accepted on August 27, 1998, and Contract 16 was executed between DASNY and Trataros on or about September 1.

Both Contracts incorporated by reference certain "General Conditions" governing the Project as a whole. Among many other things, the General Conditions contain: required representations, warranties, and guarantees by contractors; a "time-is-of-the-essence" provision; a clause reserving DASNY's right to suspend the performance of work; a definition of "Extra Work," and an exclusive process for determining additional compensation therefor; a dispute-resolution article; and several risk-allocation provisions, including a clause stipulating that contractors cannot seek "increased costs, charges, expenses or damages of any kind" against DASNY as a result of "any delays or hindrances from any cause whatsoever" relating to the Project (the "no-damages-for-delay clause").

As a condition of being awarded Contracts 15 and 16, Trataros was required to obtain certain surety bonds, including both labor and materials payment bonds (the "Payment Bonds") and performance bonds (the "Performance Bonds").[5] On or about April 27, 1998, Trataros obtained a Performance Bond and Payment Bond, each in the "penal sum" of $50,222,000, to guarantee its work under Contract 15. On or about September 1, 1998, Trataros obtained another Performance Bond and Payment Bond, each in the penal sum of $24,140,000, to guarantee its work under Contract 16. The terms and conditions of these two sets of bonds were drafted by DASNY as part of the Project's standard contract documents, and the Performance and Payment Bonds for Contracts 15 and 16 are identical in all material respects.

The issuing surety for both sets of bonds was Reliance Insurance Company ("Reliance"), and both sets of bonds named Trataros as principal and DASNY as obligee. Travelers and Reliance subsequently entered into an agreement, however, granting Travelers a power of attorney to act as administrator for the Project bonds, such that Travelers then became Trataros' surety under both the Performance and Payment Bonds.

---

**5.** Labor and materials payment bonds (also known as "payment bonds") and performance bonds are types of contractors' bonds frequently utilized in public improvement contracts. A payment bond "guarantees the owner that all bills for labor and materials contracted for and used by the contractor will be paid by the surety if the contractor defaults." N.Y. Jur.2d Bonds § 61; *see also Area Masonry, Ltd. v. Dormitory Auth.,* 64 A.D.2d 810, 407 N.Y.S.2d 279, 280–81 (4th Dep't 1978). A performance bond, by contrast, is "a bond which guarantees against a breach of contract and usually provides that if the contractor defaults and fails to complete the contract, the surety can itself complete the contract or pay damages up to the limit of the bond." N.Y. Jur.2d Bonds § 61; *see also U.W. Marx, Inc. v. Mountbatten Sur. Co., Inc.,* 3 A.D.3d 688, 770 N.Y.S.2d 777, 780–81 (3d Dep't 2004) *("U.W. Marx ").*

In order to carry out its scope of work under Contracts 15 and 16, Trataros hired various subcontractors. Among its many subcontractors were LBL Sky Systems Corporation ("LBL"),[6] Jordan Panel Systems Corp. ("Jordan Panel"),[7] G.M. Crocetti, Inc. ("Crocetti"),[8] and Brooklyn Welding Ironworks, Inc. ("Brooklyn Welding")[9] (collectively, the "Subcontractors"). In each of its subcontracts (the "Subcontracts"), Trataros included a standard "flow-down" or "conduit" provision providing that "[i]n respect of work covered by this Subcontract, and except as expressly modified herein, Subcontractor shall have all rights which contractor has under the Contract Documents, and Subcontractor shall assume all obligations, risks and responsibilities which Contractor has assumed towards Owner in the Contract Documents." Thus, pursuant to the flow-down clause, the General Conditions and other terms of Contracts 15 and 16 also became applicable to the Subcontractors.

## II. Delays on the Project

The Project, which was designed and built on a "fast-track" basis, did not proceed on schedule. Contract 15 was originally to be completed by September 1, 2000, while Contract 16 was originally to be completed by November 1, 2000. On or about August 15, 1999, the Project's construction manager, TDX, provided Trataros with a new construction schedule including a "late finish" date of September 1, 2001 for Trataros' work under both Contracts. Trataros agreed to complete its work within this new time frame, provided that it did not "encounter future circumstances causing delays" or "some unforeseen calamity."

On or about April 6, 2001, DASNY executed Change Order No. GC2–064 ("Change Order GC2–64") to formalize an extension of time for Trataros' performance of the Contracts until the aforementioned "late finish" date.[10] Change Order GC2–64 provided that Trataros' time for completion of Contract 15 would be extended 365 days, while the time for Contract 16 would be extended 304 days, thereby mandating a "new contract completion date for both Contracts of September 1, 2001." In accordance with General Conditions § 11.02 (the no-damages-for-delay clause), however, Change Order GC2–64 did not provide any additional compensation to Trataros or its subcontractors.

In about July 2001, DASNY received a temporary certificate of occupancy ("TCO") for the above-ground floors of the

---

6. Trataros subcontracted with LBL on or about May 8, 1998, for the latter to fabricate and install windows and glazed aluminum curtainwall components included within the scope of Contract 15 for the base price of about $9.3 million.

7. Trataros subcontracted with Jordan Panel on or about May 12, 1998, for the latter to fabricate and install exterior metal paneling included within the scope of Contract 15 for the base price of about $9.3 million.

8. Trataros entered into a subcontract with Crocetti for the latter to install epoxy and precast terrazzo and interior stonework within the scope of Contract 16 for the base price of about $3.0 million. The Crocetti subcontract is dated September 18, 1998, but was actually signed by Crocetti and Trataros on March 29, 1999 and April 21, 1999, respectively.

9. Trataros subcontracted with Brooklyn Welding on or about September 21, 1998, for the latter to install miscellaneous metal work within the scope of Contract 16 for the base price of $1.65 million.

10. Travelers explains that a change order is a "written authorization provided to a contractor approving a change from the original plans, specifications or other contract documents." A change order often authorizes an increase or decrease in contractor compensation in accordance with the change in work.

Project. In late August 2001, those fourteen stories opened for the use of Baruch. On or about February 1, 2002, DASNY received a TCO for the three basement levels of the Project. As of about that date, according to the parties' expert witnesses, Trataros' work under Contracts 15 and 16 became "substantially complete." At or about that time, Baruch began to occupy and use the basement levels.

On or about June 19, 2002, Travelers, Trataros, and several Trataros-affiliated individuals entered into a financing agreement (the "Financing Agreement"). Pursuant to the Financing Agreement, Trataros agreed to deposit all payments it received from any project, whether bonded by Travelers or not, into a joint checking account opened and owned by Travelers in Trataros' name (the "Joint Account"). In turn, to the extent Trataros required additional funding in order to complete its bonded projects or to pay its subcontractors or suppliers, Travelers deposited funds into the Joint Account for Trataros' use. Nonetheless, at some point between mid-2002 and early 2003, Trataros largely or entirely ceased its business operations.[11]

As a result of various delays, obstacles, and deficiencies—the responsibility for which is disputed among the parties— DASNY issued dozens of Change Orders to extend the time for work and provide extra compensation to various contractors and subcontractors. Nevertheless, in many respects, the Project participants could not reach agreement regarding who should bear the loss for certain additional costs that were incurred. Numerous subcontractors and suppliers made demands under Trataros' Payment Bonds,[12] and at least some of those demands were not honored. Litigation ultimately ensued in both state and federal fora.

## PROCEDURAL HISTORY

On August 1, 2007, Travelers commenced this action by filing a complaint (the "Complaint") asserting, *inter alia,* four separately enumerated claims against DASNY.[13] The first claim, labeled "Breach of Contract," seeks payment of certain "contract balances and retainages" allegedly due and owing to Trataros under Contracts 15 and 16.[14] The second claim, labeled "Impact Claims of Trataros" (the "Impact Claim"), seeks payment for "additional costs incurred by Trataros" resulting from "delays, lost productivity, inefficiencies, acceleration, cost escalation, and additional work." [15] The third claim, la-

11. The parties dispute the exact date. DASNY asserts that "Trataros went out of business in mid–2002." While Travelers asserts that Trataros is still an "active corporation," it concedes that "Trataros ceased business operations in Spring 2003." Trataros has never entered bankruptcy.

12. For example, in spring 2003, Crocetti filed a claim with Travelers under the Contract 16 Payment Bond seeking compensation for Crocetti's installation of epoxy terrazzo flooring at the Project.

13. This litigation is in its second round in federal court. Travelers previously filed suit in June 2004 against DASNY, TDX, and KPF. *See Travelers Cas. & Sur. Co. v. Dormitory Auth.,* No. 04 Civ. 5101(HB). After about a year of pretrial proceedings before the Honorable Harold Baer, the case was voluntarily dismissed without prejudice in October 2005 in order for the parties to pursue mediation. When the mediation failed, Travelers re-filed this litigation, and the case was reassigned to this Court.

14. DASNY does not seek summary judgment on this claim, which thus remains for trial.

15. Travelers asserts that it brings the first and second claims in its capacity as subrogee to Trataros under the Performance and Payment Bonds and/or as assignee of Trataros' legal claims.

beled "Pass Through Claims" (the "Pass–Through Claims"), seeks impact damages suffered by four of Trataros' "subcontractors' suppliers," with whom Travelers asserts it has concluded liquidating agreements. The fourth, unlabeled claim (the "Bond Losses Claim"), brought on Travelers' own behalf, seeks to recover "expenses and attorney's fees which Travelers has incurred" in its role as Trataros' surety "as a result of DASNY's [ ] acts and/or omissions."

On September 28, 2007, DASNY answered Travelers' four claims and interposed three counterclaims (the "Counterclaims") against Travelers in turn.[16] The first counterclaim (the "Payment Bond Counterclaim") asserts that Travelers failed to pay various subcontractors who made claims against Travelers under the Payment Bonds and that, as a result of ensuing state-court litigation, DASNY was compelled to pay the subcontractors instead. The second counterclaim (the "Breach–of–Contract Counterclaim") asserts that "Trataros breached Contract No. 15 and Contract No. 16[ ] by virtue of its delayed and defective work" and that Travelers should be held liable for Trataros' breach "[b]y virtue of Travelers' assumption of Trataros' obligations" under the Contracts. The third counterclaim (the "Performance Bond Counterclaim") asserts that Travelers "wrongfully rejected" DASNY's demand for payment under the Performance Bonds.

On or about February 19, 2010, Travelers and DASNY each filed motions for summary judgment. DASNY seeks dismissal of the second, third, and fourth claims asserted by Travelers, while Travelers seeks dismissal of all three Counterclaims. Travelers' motion became fully submitted on April 2, and DASNY's motion became fully submitted on April 9.

### DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making this determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); *see also Wright v. Goord*, 554 F.3d 255, 266

---

**16.** DASNY and TDX also asserted cross-claims against KPF, including breach-of-contract, professional malpractice, contractual indemnification, common-law indemnification, and contribution claims by DASNY and common-law indemnification and contribution claims by TDX. These cross-claims were dismissed by stipulation on May 13, 2010.

Also on September 28, 2007, DASNY and TDX filed a third-party complaint against Trataros asserting claims for breach of contract,

contractual and common-law indemnification, and contribution. On or about February 19, 2010, Trataros moved for partial summary judgment as to the indemnification and contribution claims. After DASNY and TDX indicated that they did not oppose the partial motion, those claims were dismissed on June 22, 2010. DASNY's two third-party breach-of-contract claims against Trataros remain to be tried.

(2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.2010) (citation omitted). Only disputes over material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

■ Almost all of the claims and Counterclaims challenged in these two motions are essentially breach-of-contract claims whose adjudication depends, in part, on contract interpretation.[17] Under New York law,[18] "[i]t is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645, 884 N.Y.S.2d 211, 912 N.E.2d 43 (2009) ("*Presstek*"). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* (citation

omitted). The parties do not appear to dispute that each written contract at issue in this litigation contains the full and complete terms of the parties' respective agreements.

■ "[A] motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir.2008). Thus, "[t]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir.2010) (citation omitted). "Whether the contract is unambiguous is a question of law for the court." *Id.* (citation omitted).

■ "In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir.2005) (citation omitted). "[A] court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 888 N.Y.S.2d 489, 493 (1st Dep't 2009) (citation omitted). "Courts may not by construction add or excise terms, nor distort the meaning of those used and

---

17. Under New York law, "[t]o establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir.2004); *accord JP Morgan Chase v. J.H. Elec. of N.Y.,*

*Inc.*, 69 A.D.3d 802, 893 N.Y.S.2d 237, 239 (2d Dep't 2010).

18. Subject matter jurisdiction over this litigation is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. The parties do not dispute that all of the claims asserted by and between Travelers and DASNY are governed by New York law.

thereby make a new contract for the parties under the guise of interpreting the writing." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404, 892 N.Y.S.2d 303, 920 N.E.2d 359 (2009) (citation omitted).

■■ The foregoing principles reflect the "general rule [that] 'parties should be free to chart their own contractual course' unless public policy is offended." *FCI Grp., Inc. v. City of N.Y.*, 54 A.D.3d 171, 862 N.Y.S.2d 352, 356 (1st Dep't 2008) (quoting *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629, 825 N.Y.S.2d 692, 859 N.E.2d 498 (2006)). "If the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir.2010) (citation omitted).

## I. Travelers' Claims Against DASNY

### A. Trataros' Impact Claim

Travelers' second claim, the Impact Claim, is "a claim against DASNY for impact damages on behalf of Travelers' bonded principal, Trataros." The Impact Claim seeks payment for "additional costs incurred by Trataros" while completing Contracts 15 and 16 and resulting from "delays, lost productivity, inefficiencies, acceleration, cost escalation, and additional work." These "additional costs" are alleged in the Complaint to have been caused by, *inter alia*, "numerous differing

site conditions"; "factors beyond the control of Trataros"; "DASNY's failure to take appropriate action to prevent unreasonable impacts to the Project"; "DASNY's failure to provide adequate coordination of the Project"; "DASNY's failure to provide non-defective plans, drawings and specifications"; "DASNY's breach of the implied covenant of good faith and fair dealing implicit in [the] Contracts"; "DASNY's gross negligence in administering the Project"; and DASNY's "active interference with" and/or "obstruction of Trataros' ability to perform [the] Contracts." Travelers alleges that the foregoing impacts "were uncontemplated by Trataros at the time it bid on the Project" and "led to unreasonable and unforeseeable delays."

### 1. No–Damages–for–Delay Clauses Under New York Law

■ DASNY asserts that the Impact Claim is barred by the no-damages-for-delay clause included in the General Conditions, which in turn were incorporated by reference into Contracts 15 and 16.[19] Section 11.02 of the General Conditions, entitled "Claims for Delay," provides:

*No claims for increased costs, charges, expenses or damages of any kind shall be made by the Contractor against the Owner for any delays or hindrances from any cause whatsoever; provided that the Owner, in the Owner's discretion, may compensate the Contractor for any said delays by extending the time*

---

**19.** DASNY appears to concede that, absent the no-damages-for-delay clause, Travelers would have a triable claim for delay damages. Under New York law, the elements of such a claim include, *inter alia*, "'that defendant was responsible for the delay; that these delays caused delay in completion of the [plaintiff's] contract (eliminating overlapping or duplication of delays); [and] that the plaintiff suffered damages as a result of these de-

lays.'" *Helena Assocs., LLC v. EFCO Corp.*, No. 06 Civ. 861(PKL), 2008 WL 2117621, at *4 (S.D.N.Y. May 15, 2008) (*"Helena Assocs."*) (quoting *Manshul Constr. Corp. v. Dormitory Auth.*, 79 A.D.2d 383, 436 N.Y.S.2d 724, 728 (1st Dep't 1981)); *see also Mid–State Precast Sys. Inc. v. Corbetta Constr. Co. Inc.*, 202 A.D.2d 702, 608 N.Y.S.2d 546, 548–49 (3d Dep't 1994).

for completion of the Work as specified in the Contract.

(Emphasis added).

■ The no-damages-for-delay clause is a type of "exculpatory clause," and as such, it is "strictly construed against the party" that relies on it. *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1008 (2d Cir. 1991). Nonetheless, such a clause "is valid and enforceable and is not contrary to public policy if the clause and the contract of which it is a part satisfy the requirements for the validity of contracts generally.'" *McNamee Constr. Corp. v. City of New Rochelle*, 60 A.D.3d 918, 875 N.Y.S.2d 265, 266 (2d Dep't 2009) ("*McNamee*") (quoting *Corinno Civetta Constr. Corp. v. City of N.Y.*, 67 N.Y.2d 297, 309, 502 N.Y.S.2d 681, 493 N.E.2d 905 (1986) ("*Corinno*")); *accord U.S. ex rel. Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 167 (2d Cir.1996) ("*Evergreen*"). The parties' inclusion of a no-damages-for-delay clause, which is "not uncommon in construction contracts," evidences the contracting parties' "'unmistakable intent' that, as between th[o]se parties, the contractor rather than the contractee is to absorb damages occasioned by contractee-caused delay." *Kalisch–Jarcho, Inc. v. City of N.Y.*, 58 N.Y.2d 377, 384, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983) ("*Kalisch–Jarcho*").[20]

■ The rule that no-damages-for-delay clauses are enforceable is "not without its exceptions, however, and even exculpatory language which purports to preclude damages for *all* delays resulting from *any* cause whatsoever are not read literally." *Corinno*, 67 N.Y.2d at 309, 502 N.Y.S.2d 681, 493 N.E.2d 905; *see also Kalisch–Jarcho*, 58 N.Y.2d at 384, 461 N.Y.S.2d 746, 448 N.E.2d 413. The New York Court of Appeals has enumerated four exceptions to the general rule that no-damages-for-delay clauses are to be enforced:

> Generally, even with such a clause, damages may be recovered for: (1) delays caused by the contractee's bad faith or its willful, malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the contractee, and (4) delays resulting from the contractee's breach of a fundamental obligation of the contract.

*Corinno*, 67 N.Y.2d at 309, 502 N.Y.S.2d 681, 493 N.E.2d 905; *see also Commercial Elec. Contractors, Inc. v. Pavarini Constr. Co., Inc.*, 856 N.Y.S.2d 46, 47 (1st Dep't 2008) ("*Pavarini*") (paraphrasing the *Corinno* standard).[21]

■ The defendant bears the "prima facie burden of establishing that the damages sought by the plaintiff are barred by the no-damage-for-delay exculpatory clause of the parties' contract." *Maric*

---

**20.** The New York Court of Appeals observed in *Kalisch–Jarcho* that "[w]hen inserted at the behest of public agencies, restrained as these almost always are by limited financial authorizations, the object of such a clause is not only the usually ascribed avoidance of 'vexatious' litigation as to whether delays are reasonable or unreasonable or, for that matter, real or fancied, but also, hopefully, to discourage dilatoriness itself." *Kalisch–Jarcho*, 58 N.Y.2d at 384, 461 N.Y.S.2d 746, 448 N.E.2d 413.

**21.** Some states also provide for an exception to no-damages-for-delay clauses based on a contractee's "active interference" with the contractor's performance. This exception was rejected by *Kalisch–Jarcho*, albeit over strong dissent, and is not included as one of the four exceptions in *Corinno*. *See Kalisch–Jarcho*, 58 N.Y.2d at 386, 461 N.Y.S.2d 746, 448 N.E.2d 413 (rejecting "active interference" exception); *id.* at 387, 387–91, 461 N.Y.S.2d 746, 448 N.E.2d 413 (Wachtler, J., dissenting) (favoring the exception).

*Mech., Inc. v. Dormitory Auth.*, 62 A.D.3d 965, 879 N.Y.S.2d 583, 583 (2d Dep't 2009) (*"Maric"*). Part of the defendant's required showing is "demonstrating prima facie that none of the exceptions to the 'damages for delay' clause are present." *Blue Water Envtl., Inc. v. Inc. Vill. of Bayville*, 44 A.D.3d 807, 843 N.Y.S.2d 681, 684 (2d Dep't 2007) (*"Blue Water"*). Once that *prima facie* burden has been met, the burden shifts to the plaintiff to "raise a triable issue of fact as the applicability of any of the [*Corinno*] exceptions to the contractual bar." *Maric*, 879 N.Y.S.2d at 583; *see also Blue Water*, 843 N.Y.S.2d at 684.

In proving that one of the *Corinno* exceptions applies, the plaintiff bears a "heavy burden." *Dart Mech. Corp. v. City of N.Y.*, 68 A.D.3d 664, 891 N.Y.S.2d 76, 77 (1st Dep't 2009) (*"Dart"*); *accord Evergreen*, 95 F.3d at 167. For example, a plaintiff may not rely on evidence that a defendant's conduct was merely negligent or unreasonable. The exculpatory clause is "specifically designed to protect the contractee from claims for delay damages resulting from its failure of performance in ordinary, garden variety ways," and thus, "a broad no-damage-for-delay clause would be meaningless unless it encompassed within its scope a range of unreasonable as well as reasonable delays because any other application would permit the exception to swallow up the general rule." *Corinno*, 67 N.Y.2d at 312–13, 502 N.Y.S.2d 681, 493 N.E.2d 905; *see also Evergreen*, 95 F.3d at 167.

General Conditions § 11.02 is, like most no-damages-for-delay clauses, a broadly worded provision. It prevents recovery for "damages of any kind ... for any delays or hindrances from any cause whatsoever." Similarly worded clauses have been held to bar many kinds of damages, no matter how labeled or characterized by a plaintiff.[22] In *Corinno*, the New York Court of Appeals rejected the plaintiffs' attempt to distinguish "[claims] for increased costs in labor, materials, and equipment occurring prior to the expiration of the contract period" from "claims for damages resulting from a delay of the project beyond the scheduled completion date," finding that both were barred by the no-damages-for-delay clause. *Corinno*, 67 N.Y.2d at 313, 502 N.Y.S.2d 681, 493 N.E.2d 905. The Court of Appeals observed that "[a]ll delay damage claims seek compensation for increased costs," and concluded that, however the plaintiffs' claims were characterized, "[t]he claims are claims for delay and the exculpatory clause was drafted and included in the contract to bar them." *Id.* at 313–14, 502 N.Y.S.2d 681, 493 N.E.2d 905.

### 2. The Applicability of *Corinno* Exceptions

In seeking to avoid the no-damages-for-delay clause, Travelers relies principally upon the "uncontemplated delay" exception. Travelers also contends, in passing, that the "gross negligence" exception applies as well.[23] Each of these two excep-

---

**22.** *See Nova Cas. Co. v. Liberty Mut. Ins. Co.*, 540 F.Supp.2d 476, 483 (S.D.N.Y.2008) (*"Nova"*) (concluding that plaintiff's "equitable adjustment" claim for "loss of productivity, materials escalation, labor escalation, extended field overhead, and extended equipment rental" was "really just a masked 'damages for delay' claim" and therefore barred); *Permis Constr. Corp. v. N.Y. City*

*Hous. Auth.*, 5 A.D.3d 194, 773 N.Y.S.2d 58, 59 (1st Dep't 2004) ("[R]egardless of the label attached to it, [the contractor's claim] amounts to a delay claim that is barred by the no-damages-for-delay clause of the contract.").

**23.** Although Travelers pleads all four *Corinno* exceptions in its Complaint, Travelers appears to have abandoned on summary judgment its

tions is discussed below.[24]

### a. Uncontemplated Delay

The second *Corinno* exception applies where " 'the delays or their causes were not within the contemplation of the parties at the time they entered into the contract.' " *McNamee*, 875 N.Y.S.2d at 267 (quoting *Corinno*, 67 N.Y.2d at 309–10, 502 N.Y.S.2d 681, 493 N.E.2d 905). The exception is "based on the concept of mutual assent." *Corinno*, 67 N.Y.2d at 310, 502 N.Y.S.2d 681, 493 N.E.2d 905. "It can hardly be presumed ... that the contractor bargained away his right to bring a claim for damages resulting from delays which the parties did not contemplate at the time" of entering into the contract. *Id.* Therefore, "even broadly worded exculpatory clauses ... are generally held to encompass only those delays which are reasonably foreseeable, [which] arise from the contractor's work during performance, or which are mentioned in the contract." *Id.*; *see also Blue Water*, 843 N.Y.S.2d at 684 (delays must be "wholly unanticipated" to be actionable (citation omitted)); *N. Star Contracting Corp. v. City of N.Y.*, 203 A.D.2d 214, 611 N.Y.S.2d 11, 12 (1st Dep't 1994) (same).

New York courts apply several general principles in determining whether a delay was "uncontemplated." These principles were summarized recently in *Premier–New York, Inc. v. Travelers Prop. Cas. Co.*, a delay-damages case also arising out of this Project. Index No. 603043–2003, 20 Misc.3d 1115(A), 2008 WL 2676800 (Sup.Ct. N.Y. County July 8, 2008) (*"Premier"*). In *Premier*, Justice Fried explained, first, that "[i]t is not necessary that the contract specifically contemplate the exact occurrences giving rise to the delay; all that is required is that the class of occurrence have been contemplated." *Id.* at *13; *see also Blau Mech. Corp. v. City of N.Y.*, 158 A.D.2d 373, 551 N.Y.S.2d 228, 230 (1st Dep't 1990) (*"Blau"*); *Buckley & Co. v. City of N.Y.*, 121 A.D.2d 933, 505 N.Y.S.2d 140, 142 (1st Dep't 1986) (*"Buckley"*). Second, where a contract "discusses a potential cause (or class of causes) of delay, subsequent delays arising from that cause are considered to have been contemplated by the parties." *Premier*, 2008 WL 2676800, at *13; *see Blau*, 551 N.Y.S.2d at 229–30; *Visconti Corp. v. LaBarge Bros. Co., Inc.*, 272 A.D.2d 948, 707 N.Y.S.2d 566, 567 (4th Dep't 2000) (*"Visconti"*). Third, "ordinary, garden variety" poor performance by the contractee is within the contemplation of the parties, *Corinno*, 67 N.Y.2d at 313, 502 N.Y.S.2d 681, 493 N.E.2d 905, and therefore conduct by a contractee "amount[ing] to nothing more than inept administration or poor planning" does not fall within the *Corinno* exceptions. *Pavarini*, 856 N.Y.S.2d at 47.[25] Fourth, delays resulting from fail-

---

arguments based on the other two *Corinno* exceptions.

24. Carolina Casualty Insurance Company ("Carolina"), the surety to Crocetti, argues in its separate brief opposing summary judgment that there is a further triable question regarding whether the fourth *Corinno* exception, "breach of a fundamental obligation," applies with respect to Crocetti's impact claims. Because Crocetti's claims are dismissed on other grounds, however, this exception need not be considered.

25. *See also Blue Water*, 843 N.Y.S.2d at 684 (distinguishing "inept administration" from "willful interference"); *Bat–Jac Contracting, Inc. v. N.Y. City Hous. Auth.*, 1 A.D.3d 128, 766 N.Y.S.2d 352, 352 (1st Dep't 2003) (*"Bat–Jac"*) (affirming grant of summary judgment where plaintiff's claim was "tantamount to an allegation of poor contract administration"); *T.J.D. Constr. Co., Inc. v. City of N.Y.*, 295 A.D.2d 180, 743 N.Y.S.2d 111, 112 (1st Dep't 2002) (*"T.J.D."*) (concluding that "the poor planning and scheduling of which plaintiff complains 'amounted to no more than inept administration' within the scope of the no-

ures of coordination are within the contemplation of the parties in cases of complex, multi-contractor litigation. *See Premier*, 2008 WL 2676800, at *12; *Gottlieb Contracting, Inc. v. City of N.Y.*, 86 A.D.2d 588, 446 N.Y.S.2d 311, 312 (1st Dep't 1982).

■ DASNY has shown that the damages Travelers seeks in the Impact Claim are barred by the no-damages-for-delay clause in the General Conditions, and that none of the *Corinno* exceptions applies. In attempting to create a triable issue of fact, Travelers relies on the following evidence and arguments. First, Travelers observes—relying on the parties' expert consensus that Trataros' work under the Contracts was substantially completed by about February 1, 2002, when a TCO was issued for the Project's three basement levels—that "Contract[s] 15 and 16 were respectively extended 17 months and 15 months longer than anticipated."[26] Second, Travelers contends that KPF committed numerous "design errors and omissions" throughout the Project, resulting in "prodigious amounts of requests for information ('RFIs')," and that this "professional negligence" was not contemplated by Trataros at the time of bidding.[27] To support this assertion regarding KPF's negligence, Travelers relies heavily on various

accusations made by DASNY in a May 2002 demand letter claiming damages against KPF for the latter's allegedly faulty design work, a letter which Travelers characterizes as constituting an admission by DASNY that KPF was negligent. Third, Travelers asserts that TDX was also negligent because its "CPM schedules used to manage and coordinate the work of the prime contracts was [sic] inadequate for the size and scope of this project, riddled with logical flaws, and manipulated to maintain artificial deadlines imposed by the owner." Finally, Travelers apparently relies on the conclusions of Buric and another expert, Cashin Spinelli & Ferretti, LLC ("CSF"), that the delays experienced by Trataros could not have been contemplated or foreseen at the time of contracting.[28]

Travelers has failed to demonstrate a triable issue of fact. Several considerations compel this result. First, Travelers has failed, with perhaps a single exception discussed below,[29] to describe with any precision what its Impact Claim addresses, much less to present admissible evidence demonstrating who was responsible for any particular category of Impact Claim damages; how that malfeasance damaged Trataros; and how those damages were

---

damages-for-delay clause" (citation omitted)); *S.N. Tannor, Inc. v. A.F.C. Enters., Inc.*, 276 A.D.2d 363, 714 N.Y.S.2d 273, 274 (1st Dep't 2000) ("*S.N. Tannor*") (noting that the "actions by [defendant] alleged to have caused the complained of delays and [to have] necessitated extra work amounted to no more than inept administration and, as such, fall within the subcontract's exculpatory provisions").

26. For example, the expert report of R.V. Buric Construction Management Consultants, Inc. ("Buric") concludes that the "performance period" for Contract 15 ran for 1,381 calendar days instead of the planned 876, and that Contract 16 ran for 1,255 days instead of the planned 856.

27. Travelers also contends that "Trataros directly issued over 650 RFIs seeking clarification of the contracts plans [sic] and specifications," and that DASNY and TDX acknowledged that the "amount of RFIs significantly impacted Trataros" through comments contained in change order memoranda prepared by TDX.

28. Travelers also relies on much of the foregoing reasoning to support its Subcontractors' Pass–Through Claims. The Pass–Through Claims are discussed in Section I.B below.

29. This exception is the "Girt Tolerance Issue" addressed in Subsection I.B.3 below.

uncontemplated by the parties at the time of entering into Contracts 15 and 16. This last point is fatal since the Contracts explicitly contemplated many of the types of delay for which Trataros and its Subcontractors appear to be seeking damages. Contracts 15 and 16 allocated risk for, and thereby contemplated, many potential sources of delay, including: delays resulting from the acts or omissions of other prime contractors and their subcontractors;[30] delays resulting from the Owner's reasonable "suspension, interruption or delay" of a contractor's performance;[31] delays resulting from a contractor's own manpower and supply issues;[32] delays resulting from limited hoist or elevator availability;[33] and delays resulting from early occupancy of the Project by the Owner.[34] Moreover, the bidding documents for Contracts 15 and 16 warned Trataros and other prospective bidders to "examine the Contract Documents carefully" and to "inspect[ ] the Site" prior to bidding.[35] Thus, insofar as Travelers' "Impact Claim" seeks to recover additional costs relating to the foregoing causes of delay—bearing in mind that Travelers' asserted bases for seeking delay damages include such vague categories as "numerous differing site conditions" and "factors beyond the control of Trataros"—those claims were contemplated by the contract and therefore cannot be recovered under the "uncontemplated delay" exception.[36]

**30.** General Conditions § 13.01, entitled "Cooperation with Other Contractors," provides *inter alia* that "[s]hould the Contractor sustain any damage through any act or omission of any other contractor having a contract with the Owner or through any act or omission of any Subcontractor of said other contractor, the Contractor shall have no claim against the Owner for said damage."

**31.** General Conditions § 10.04, entitled "Suspension of Work," provides that "[t]he Owner may order the Contractor in writing to suspend, delay or interrupt performance of all or any part of the Work for a reasonable period of time as the Owner may determine," and stipulates that "such suspension, interruption or delay of the performance of the Work … shall not increase the cost of performance of the Work of this Contract."

**32.** General Conditions § 5.02, entitled "Representations of Contractor," provides that the "Contractor represents and warrants" that it "has the staff, manpower, equipment, subcontractors, and suppliers available to complete the Work within the time specified for the contract price."

**33.** Section 1500.05(B)(1), included in the Supplemental General Requirements to both Contracts 15 and 16, provides that "[n]o claims or extras will be entertained because of limited availability of the hoists." Section 1500.06(A)(4), likewise included in both Supplemental General Requirements, provides that "[n]o claims or extras will be entertained because of limited availability of the material elevators for hoisting." Section 1500.07(A)(5), also in both, provides that "[n]o claims or extras will be entertained because of limited availability of the hoist/elevators."

**34.** General Conditions § 16.01, entitled "Occupancy Prior to Acceptance," provides in pertinent part that "[i]f, before, Construction Completion, the Owner desires Beneficial Occupancy of the Work, or any part thereof, which is completed or partly completed, or to place or Install therein equipment and furnishings, the Owner shall have the right to do so."

**35.** The "Information for Bidders" with Contracts 15 and 16 indicated that "[a]t the time of the opening of bids, each Bidder shall be presumed to have inspected the Site and to have read and to be familiar with all the Contract Documents."

**36.** No-damages-for-delay clauses are routinely enforced when contract provisions demonstrate that the causes of delay on which the plaintiff relies in bringing its delay-damage claim were anticipated by the parties. *See, e.g., Dart,* 891 N.Y.S.2d at 77; *McNamee,* 875 N.Y.S.2d at 267; *Universal/MMEC, Ltd. v. Dormitory Auth.,* 50 A.D.3d 352, 856 N.Y.S.2d 560, 561 (1st Dep't 2008) (*"Universal/MMEC"*); *Pavarini,* 856 N.Y.S.2d at 47;

Likewise, to the extent that the Impact Claim is actually a request for payment for extra work masquerading as a delay-damages claim, that claim would be foreclosed by the Contracts' requirement that such requests be made through a specific process set forth in the General Conditions. First, § 8.01(A) of the General Conditions provides:

> Without invalidating the Contract, the Owner may order Extra Work or make changes by altering, adding to, or deducting from the Work, the Contract consideration being adjusted accordingly. No claims for Extra Work shall be allowed unless such Extra Work is ordered in writing by the Owner. No changes in the Work shall be made unless such Work is ordered in writing by the Owner or Owners [sic] Representative. If the time for completion is affected by this change the revised time for completion shall be included in the change order. The Owner may order the Contractor to perform the Extra Work and proceed under the Dispute Article [i.e., Article 11].

(Emphasis added). In turn, if a contractor wishes to make an extra-work claim, the contractor must follow the process specified in General Conditions § 11.01(A). That Subsection provides that within "fifteen (15) working days after being ordered to perform the Work claimed by the Contractor to be Extra Work," the contractor must give written notice, including a cost estimate and a formal request for a determination by the Owner as to whether the claim involves extra work. Section 11.01(A) further mandates that "[t]he Contractor's failure to comply with any or all parts of [Article 11] shall be deemed to be: (1) a conclusive and binding determination ... that said order, Work, action or omission does not involve Extra Work" and "(2) a waiver by the Contractor of all claims for additional compensation or damages as a result of said order, Work, action or omission."

Second, even where the Contracts did not explicitly discuss the delay-causing "factors" upon which Travelers may be relying, the sources of delay alluded to by Travelers in its briefing were nevertheless clearly within the contemplation of the parties at the time of contracting. Claims for damages based on "ordinary, garden variety" delays arising from an owner's negligent supervision, a fellow contractor's defective or delayed performance, an architect's slow review of shop drawings, and the like, are all routinely barred by a no-damages-for-delay clause.[37] *Corinno*, 67

*Grace Indus., Inc. v. N.Y. City Dep't of Transp.*, 22 A.D.3d 262, 802 N.Y.S.2d 409, 410 (1st Dep't 2005) ("*Grace*"); *T.J.D.*, 743 N.Y.S.2d at 111; *Visconti*, 707 N.Y.S.2d at 567; *Burt Welding & Auto. Repair Inc. v. U.W. Marx Inc.*, 272 A.D.2d 737, 707 N.Y.S.2d 548, 549 (3d Dep't 2000).

37. *See, e.g., Blue Water*, 843 N.Y.S.2d at 684 ("foreseeable winter weather" and delays caused by "decisions made by entities specifically mentioned in the contract, to wit, the owner and/or engineer"); *Harrison & Burrowes Bridge Constructors, Inc. v. State*, 42 A.D.3d 779, 839 N.Y.S.2d 854, 856–57 (3d Dep't 2007) ("cold weather" and "delays in reviewing shop drawings [which] delayed the entire project"); *Landis & Gyr Powers, Inc. v.*

*Berley Indus., Inc.*, 298 A.D.2d 435, 750 N.Y.S.2d 82, 83 (2d Dep't 2002) ("delays allegedly caused by [prime contractor's] mismanagement of the project and failure to compel another subcontractor ... to timely and properly perform work upon which the plaintiff's work depended," thereby causing 418–day delay); *S.N. Tannor*, 714 N.Y.S.2d at 274 (contractor's actions "amounted to no more than inept administration and, as such, fall within the subcontract's exculpatory provisions"); *Martin Mech. Corp. v. P.J. Carlin Constr. Co.*, 132 A.D.2d 688, 518 N.Y.S.2d 166, 168 (2d Dep't 1987) (defendants' conduct "merely amounted to bad administration"). *But see J.R. Stevenson Corp. v. Westchester County*, 113 A.D.2d 918, 493 N.Y.S.2d 819,

N.Y.2d at 313, 502 N.Y.S.2d 681, 493 N.E.2d 905. Thus, the delays for which Trataros may be seeking compensation, insofar as they are articulated, appear to be unremarkable, foreseeable risks of construction.

Third, any consideration of what was reasonably within the contemplation of the parties at the time of contracting must take into account the commercial context. Trataros was the last of around a dozen prime contractors to join a complex construction project in the heart of a busy commercial neighborhood in this City, and it did so with full knowledge of the number of other participants involved. Having been supplied before bidding with all of the Contract Documents—documents which Trataros was required to review—Trataros was also well aware that the Project was architecturally "ambitious" (as Travelers alleged in the Complaint). The fact that design modifications, delays, or other difficulties could arise on such a project would not surprise a prudent bidder. *Cf., e.g., McNamee*, 875 N.Y.S.2d at 267 ("experienced excavator[ ] must have reasonably foreseen the possibility that a utility company would be unable or unwilling to move its underground lines"). By nonetheless submitting bids on those Contracts,[38] Trataros committed itself to acquiring two contractual bundles of rights, duties, and risks that, by Trataros' own valuation, were worth approximately $50 million and $24 million respectively. As a commercially sophisticated actor with extensive experience in the construction industry, Trataros could be expected to review the risk allocation provisions contained in the Contracts (which, as both parties observe, were not unlike those contained in other DASNY contracts) and to have contemplated those provisions carefully in determining the amounts of each bid. As such, there is no reason not to hold Trataros to its bargain.[39] *See Kalisch–Jarcho*, 58 N.Y.2d at 384, 461 N.Y.S.2d 746, 448 N.E.2d 413 (noting that no-damages-for-delay clauses are enforceable, "especially when entered into at arm's length by sophisticated contracting parties").

Indeed, New York courts treat with skepticism claims by sophisticated commercial actors that the terms for which they bargained should not be enforced, finding that such an outcome would undermine freedom of contract.[40] Particularly where complicated, high-dollar value contracts are at issue, courts are skeptical of claims that certain risks were "uncontemp-

---

824 (2d Dep't 1985) ("[E]vidence indicating that there had been close to 1000 revisions and clarifications to the contract plans coupled with the related evidence regarding alleged misrepresentations regarding ground water conditions, drainage systems and underground electrical lines, raise triable issues of fact which cannot be resolved merely by reference to the motion papers submitted.").

38. Materials included with DASNY's summary judgment papers reveal that, for Contract 15, there were 5 bidders and 35 "plan holders" (i.e., potential bidders). Trataros, which was awarded Contract 15, had the lowest bid by a margin of approximately $1.3 million. For Contract 16, there were at least 4 bidders and at least 30 plan holders. This time, Trataros had only the second-lowest bid, but was nevertheless awarded the Contract.

39. As Travelers itself argued to the court in the *Premier* litigation, "the policy favoring enforcement of the party's bargain is most applicable when the parties are sophisticated business enterprises with substantial experience."

40. *See, e.g., S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277, 793 N.Y.S.2d 835, 826 N.E.2d 806 (2005); *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995) ("*Oppenheimer*"); *Flag Wharf, Inc. v. Merrill Lynch Capital Corp.*, 40 A.D.3d 506, 836 N.Y.S.2d 406, 406 (1st Dep't 2007).

lated" at the time of contracting. As Justice Scheinkman observed with respect to another ambitious Manhattan building project:

The Court is not unmindful that Plaintiff undertook a $61.5 million Contract. To the extent that the problems complained of under these causes of action were made Plaintiff's problems by the terms of the Contract, Plaintiff agreed to assume them in exchange for the contract price. To the extent that Plaintiff assumed the problems but is now complaining that the compensation is not sufficient, Plaintiff is bound by the provisions it agreed to.

*Century–Maxim Constr. Corp. v. One Bryant Park, LLC,* Index No. 24683–2008, 23 Misc.3d 1120(A), 2009 WL 1218895, at *21 (Sup.Ct. Westchester County Apr. 7, 2009).

Finally, Travelers cannot achieve a triable claim based solely on its experts' conclusions that the delays were "unreasonable" or could not have been contemplated by Trataros at the time of contracting. "An expert's report is not a talisman against summary judgment." *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 512 (2d Cir.2010) (citation omitted). "Although the [expert] reports must be construed in the non-moving party's favor, if the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to ... grant summary judgment for defendant." *Id.* Having failed to tender other admissible evidence to raise a question of fact that the delays were uncontemplated by the parties, the opinions expressed in the CSF and Buric expert reports that the "[t]he numerous delays experienced by Trataros could not have been foreseen when Trataros entered into its Contract(s)" and that "the impacts were of a nature and duration that no contractor could have reasonably

foreseen or discovered at the time the contracts were signed" are insufficient to raise any question of fact. Accordingly, Travelers has failed to present evidence to create a triable issue of fact as to the "uncontemplated delay" exception.

### b. Gross Negligence

 Travelers also appears to contend that the no-damages-for-delay clause may not be enforced because Trataros' damages were "caused by [DASNY's] bad faith or its willful, malicious, or grossly negligent conduct." *Corinno,* 67 N.Y.2d at 309, 502 N.Y.S.2d 681, 493 N.E.2d 905. "More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing." *Kalisch–Jarcho,* 58 N.Y.2d at 385, 461 N.Y.S.2d 746, 448 N.E.2d 413; *see also A.H.A. Gen. Constr., Inc. v. N.Y. City Hous. Auth.,* 92 N.Y.2d 20, 31, 677 N.Y.S.2d 9, 699 N.E.2d 368 (1998) ("*A.H.A.*"). Conduct that "betokens a reckless indifference to the rights of others" constitutes "gross negligence" for the purposes of this exception. *Kalisch–Jarcho,* 58 N.Y.2d at 385, 461 N.Y.S.2d 746, 448 N.E.2d 413.

 Travelers has failed to adduce evidence raising a triable issue of fact as to whether DASNY was grossly negligent. Travelers has tendered evidence indicative of, at worst, ordinary negligence. Delays arising out of "no more than ordinary negligence at most" are barred by a no-damages-for-delay clause. *Obremski v. Image Bank, Inc.,* 30 A.D.3d 1141, 816 N.Y.S.2d 448, 450 (1st Dep't 2006); *see also Teddy Giannopulos Gen. Contractors, Inc. v. N.Y. City Hous. Auth.,* 260 A.D.2d 253, 688 N.Y.S.2d 536, 537 (1st Dep't 1999).

### 3. Waiver of No–Damages–for–Delay Clause

▊▊▊ Travelers asserts that, even if none of the *Corinno* exceptions applies, DASNY has nonetheless waived its right to enforce the no-damages-for-delay clause. "Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104 (2006) ("*Portfolio Advisors*"). "[W]aiver of a contractual right 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage ... and must be based on a clear manifestation of intent to relinquish a contractual protection.' " *Natale v. Ernst,* 63 A.D.3d 1406, 881 N.Y.S.2d 232, 233 (3d Dep't 2009) (quoting *Portfolio Advisors,* 7 N.Y.3d at 104, 817 N.Y.S.2d 606, 850 N.E.2d 653); *accord Capitol Records, Inc. v. Naxos of Am., Inc.,* 372 F.3d 471, 482 (2d Cir.2004). "A waiver is not created by negligence, oversight, or thoughtlessness, and cannot be inferred from mere silence. Rather, there must be proof that there was a voluntary and intentional relinquishment of a known and otherwise enforceable right." *Golfo v. Kycia Assocs., Inc.,* 45 A.D.3d 531, 845 N.Y.S.2d 122, 124 (2d Dep't 2007) (citation omitted). Moreover, for the parties' conduct to amount to a waiver, "it 'must not otherwise be compatible with the agreement as written,' " and " 'the conduct of the parties must evidence an indisputable mutual departure from the written agreement.' " *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 783 (2d Cir.2003) (quoting *Rose v. Spa Realty Assocs.,* 42 N.Y.2d 338, 344, 346, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977)). "[T]he existence of an intent to waive a contractual right generally presents a question of fact." *Natale,* 881 N.Y.S.2d at 233; *accord Portfolio Advisors,* 7 N.Y.3d at 104, 817 N.Y.S.2d 606, 850 N.E.2d 653. Because the effect of waiver is to "relinquish a contractual protection," however, "waiver should not be lightly presumed." *Portfolio Advisors,* 7 N.Y.3d at 104, 817 N.Y.S.2d 606, 850 N.E.2d 653 (citation omitted).

Travelers' waiver argument depends upon the following assertions. First, Travelers argues that "DASNY's conduct in executing and paying a number of change orders in payment of delay and impact costs served to waive the exculpatory clauses." Travelers contends that DASNY's payments to Trataros included "change orders [constituting] explicit settlements of delay claims asserted by a number of Trataros' subcontractors" as well as "change orders compensating Trataros for extra costs incurred as a result of Project delays." Travelers asserts that DASNY executed and paid at least twelve change orders constituting settlements of delay claims asserted by Trataros' subcontractors.[41] Travelers observes that each of the change orders was accompanied by a memorandum from TDX indicating, *inter alia,* that "[a]ppropriate consideration will be made at a future date, in accordance with contractual obligations for any time impact to the contract and costs associated with same." Travelers also points to several "supplementary worksheets" prepared by DASNY as part of its change-order

---

**41.** These change orders were issued as to Crocetti in November 2001 (the "Crocetti Change Order"); AMMFE Inc. in August 2002; Stretchwall Installations, Inc., Shroid Construction, Inc., DAG Floors, Inc., Mometal, Inc., Component Assembly System, Inc., L & L Painting Inc., and Klepp Wood Flooring Corp. in September 2003; Ace Elevator Co., Inc. and Constructamax, Inc. in February 2004; and R & J Construction Corp. in February 2005. The amounts of these change order payments ranged from less than $4,000 to more than $1 million.

evaluation process indicating that DASNY "assumed responsibility" for a given percentage of the delay experienced by each subcontractor.[42] As a result, Travelers contends that "compensation for delay was not only the primary motive for the issuing of the change orders, but an ongoing basis for potential reimbursement." Travelers also observes that DASNY executed at least six change orders to settle delay claims made by other prime contractors.

 Travelers' waiver argument cannot succeed. Travelers overlooks that all but one of the twelve change orders upon which it relies include express reservations by DASNY of its contractual rights.[43] In particular, these eleven change orders provide, in pertinent part:

> This change order is *issued pursuant to Article 11 of the Contract.* Neither this Change Order nor the extension of time for performance granted hereunder constitutes an admission by DASNY that it is responsible for any delays or hindrances to work under the Contract. *No claims for* increased costs, changes, expenses, or *damages of any kind shall be made by the Contractor against DAS-NY for any delays or hindrances from any cause whatsoever,* including but not limited to any delays or hindrances contemplated by this Change Order. *DAS-*

> *NY reserves its rights to rely on and enforce the terms of the contract and New York law in connection with this Change Order.* DASNY further reserves its right to independently assess and allocate responsibility for delay to the Contract.

(Emphasis added).[44] (Article 11, entitled "Disputes," is the section of the General Conditions which, *inter alia,* governs claims for extra work and which contains the no-damages-for-delay clause.) Moreover, even the accompanying TDX memoranda state that *"[a]ny time impact* to the contract or any costs associated with an extension of time to the contract *is not acknowledged* and *has not been determined* at this time," and that "[a]ppropriate consideration will be made at a future date, *in accordance with contractual obligations* for any time impact to the contract and costs associated with same" (emphasis added). The change orders' express invocation and reservation of DASNY's Article 11 rights shows that DASNY's conduct was not " 'a clear manifestation of intent to relinquish a contractual protection,' " *Natale,* 881 N.Y.S.2d at 233 (quoting *Portfolio Advisors,* 7 N.Y.3d at 104, 817 N.Y.S.2d 606, 850 N.E.2d 653). A party does not make "ma[k]e the conscious choice" to waive its rights by explicitly reserving its power to enforce them. *Mooney v. City of*

---

**42.** These percentages range from 32% to 75%.

**43.** Unlike the eleven other change orders, the Crocetti Change Order does not contain an explicit reservation of rights or otherwise signal DASNY's continued reliance on Article 11 of the General Conditions. Rather, the Crocetti Change Order states on its face that it is "an advance allocation of funds, for the anticipated settlement, of the sub contractor's (Crocetti) delay claim." The Crocetti Change Order indicates that "[t]he advance payment pertains to the escalation portion only," and that "[t]he lost productivity portion shall be addressed at a later date." Because Crocetti's delay claim must be dismissed on other grounds, however, it need not be decided whether a triable issue of fact exists regarding whether DASNY waived its rights vis-à-vis Crocetti.

**44.** Change Order GC2–64—the order extending Trataros' time for completion on Contracts 15 and 16 until September 1, 2001—also affirmed that it was "being issued pursuant to Article 11 Disputes, Section 11.02 Claims for Delay" and mandated that "[n]o claims for increased costs, changes, expenses or damages of any kind shall be made by Trataros against DASNY for any delays or hindrances from any cause whatsoever, including but not limited to any delays or hindrances contemplated by this change order."

*N.Y.*, 219 F.3d 123, 131 (2d Cir.2000) (citation omitted); *see also, e.g., 225 Fifth Ave. Retail, L.L.C. v. 225 5th L.L.C.*, Index No. 601659–2007, 24 Misc.3d 1224(A), 2009 WL 2208336, at *10 (Sup.Ct. N.Y. County July 7, 2009) (reservation-of-rights statement negated any possible inference of waiver based on parties' course of conduct).

Second, Trataros itself waived whatever rights it has to seek delay damages from DASNY with respect to the disputes for which DASNY has already executed a change order settlement. By signing each change order and accepting payment, Trataros explicitly agreed to "release and forever discharge [DASNY] from any and all actions, causes of action, claims and demands whatsoever . . . in any way arising out of this change." [45] *Cf. Nova*, 540 F.Supp.2d at 481 (contractor waived its right to seek additional damages from DASNY by virtue of the "clear and unambiguous" printed release contained in prior change orders executed by DASNY and accepted by the contractor); *Northgate Elec. Corp. v. Barr & Barr, Inc.*, 61 A.D.3d 467, 877 N.Y.S.2d 36, 37 (1st Dep't 2009) (plaintiff's delay-damage claim "barred by the release clause" contained in "global change order"). Thus, these change orders not only reserved DASNY's right to rely on the no-damages-for-delay clause but also constitute a waiver of Trataros' right to seek damages arising from the conditions addressed in the change order.

 The worksheets prepared by DASNY also do not raise a triable question of waiver. Travelers relies on a certain line entry in each worksheet which reads, "DASNY assumed responsibility," followed by a particular percentage value. For example, on Change Order GC2–201, which settled a claim made by DAG Floors, Inc., the worksheet indicates that "DASNY [a]ssumed [r]esponsibility" for 66% of the delay. Nonetheless, DASNY's recognition, as a *factual* matter, that it played a role in causing delay is not equivalent to an admission of a *legal* obligation to compensate Trataros for those delays. Indeed, the very purpose of a no-damages-for-delay clause is to bar damages even where the factual cause of delay is, undisputedly, the owner. *See, e.g., Evergreen*, 95 F.3d at 167 ("Lest the exceptions swallow the rule, delay clauses proscribe damages for a broad range of both reasonable and unreasonable delays."). DASNY's internal worksheets simply do not indicate an intent on the part of Travelers to forgo its contractual rights, and the language of the change orders themselves shows the opposite.

The cases upon which Travelers relies do not compel a different result. Travelers relies heavily on *Plato General Construction Corp./EMCO Tech Construction Corp., JV. LLC v. Dormitory Authority of the State of New York* ("*Plato*"), a recent case in which the Brooklyn Supreme Court found that a triable question of fact existed regarding whether DASNY waived a no-damages-for-delay clause identical in its terms to the one at issue in this litigation.

---

**45.** On one of the twelve change orders executed by DASNY—Change Order GC2–147, which settled a claim brought on behalf of Trataros' subcontractor AMMFE Inc.—there is an asterisked note accompanying Trataros' signature stating: "See Trataros proposal which includes a statement regarding reservation of rights for add. cost + time extension." Trataros' letter proposal, in turn, states that Trataros would "not withstanding the release . . . reserve[] its rights concerning any such impact, as well as its right to seek an appropriated [sic] extension of time." The other eleven change orders, by contrast, do not reference on their face any reservation of rights by Trataros.

*Plato,* Index No. 9446–2005, 21 Misc.3d 1138(A), 2008 WL 5073190, at *11 (Sup.Ct. Kings County Dec. 2, 2008). *Plato* is at odds with the precedent cited above and is neither binding nor persuasive in its analysis. It will not be followed.

Travelers' claim is also not salvaged by its reliance on *Eldor Contracting Corp. v. County of Nassau,* 6 A.D.3d 654, 775 N.Y.S.2d 556 (2d Dep't 2004) (*"Eldor"*).[46] In *Eldor,* the Appellate Division expressed its conclusion that "[t]he plaintiff adduced sufficient evidence from which a jury could reasonably conclude that the County waived th[e] [no-damages-for-delay] clause." *Id.* at 557. The *Eldor* court did not, however, discuss the evidence upon which it relied in making that determination. The bare holding of another court that a no-damages-for-delay clause might have been waived does not necessarily compel the same result on different facts. As such, Travelers' Impact Claim against DASNY must be dismissed.

### B. Subcontractors' Pass–Through Claims

DASNY also seeks dismissal of the third count of the Complaint, the Pass–Through Claims, which Travelers characterizes as claims for "impact damages against DASNY on behalf of Trataros' subcontractors." Travelers identifies these subcontractors as LBL, Jordan Panel, Crocetti, and Brooklyn Welding. Travelers asserts that it has admitted contingent liability to the Subcontractors by concluding separate liquidating agreements with LBL, Jordan Panel, and Brooklyn Welding[47] and by incorporating a liquidating agreement into Crocetti's subcontract itself.

The general rule under New York law is that even where an owner causes delay that injures a subcontractor, "[s]ubcontractors, lacking privity of contract, are precluded from bringing suit against the owners directly." *Bovis Lend Lease LMB Inc. v. GCT Venture, Inc.,* 285 A.D.2d 68, 728 N.Y.S.2d 25, 27 (1st Dep't 2001) (*"Bovis"*). Furthermore, "absent a contractual commitment to the contrary, a prime contractor is not responsible for delays that its subcontractors may incur unless those delays are caused by some agency or circumstance under the prime contractor's direction or control." *Triangle Sheet Metal Works, Inc. v. James H. Merritt & Co.,* 79 N.Y.2d 801, 802, 580 N.Y.S.2d 171, 588 N.E.2d 69 (1991) (*"Triangle"*); *accord Thalle Constr. Co., Inc. v. Whiting–Turner Contracting Co., Inc.,* 39 F.3d 412, 418 (2d Cir.1994). Not only may the subcontractor not sue the general contractor directly, but the general contractor typically may not sue the owner on the subcontractor's behalf, because "[g]eneral contractors on a construction project which have sustained no injury may not bring suit on behalf of a subcontractor for additional costs caused by the owner's delays." *Bovis,* 728 N.Y.S.2d at 27; *see also Barry, Bette & Led Duke Inc. v. State,* 240 A.D.2d 54, 669 N.Y.S.2d 741, 743 (3d Dep't 1998) (*"Barry"*). Taken together, these principles would seem to leave a subcontractor who sustains damage from purely

---

**46.** Travelers also cites *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.,* 983 F.2d 1176 (2d Cir.1993), but that case is inapposite. *Williams & Sons* concerned the question of whether a no-damages-for-delay clause was ambiguous, given the existence of a conflicting provision in the contract, and not the question of whether the clause had been waived. *Id.* at 1183–84.

**47.** Trataros and Travelers jointly concluded liquidating agreements with LBL, Jordan Panel, and Brooklyn Welding on or about, respectively, June 30, 2004; June 8, 2004 (as amended on July 14, 2004); and February 23, 2005.

owner-caused delay without any legal recourse.

New York law has, however, created a safety valve in the form of a "liquidating agreement," which is a contractual device specifically designed to overcome the aforementioned "legal impediments" to an injured party's recovery. *Bovis*, 728 N.Y.S.2d at 27. Liquidating agreements are written agreements by which an intermediary (for example, a general contractor) admits liability to an injured contractual counterparty (for example, a subcontractor) and then agrees to pursue a claim for damages on behalf of that injured counterparty against a different, responsible party with whom the intermediary is also in privity (for example, an owner).[48] "The courts of New York and other jurisdictions recognize liquidating agreements as a valid mechanism for bridging the privity gap between owners and subcontractors who sustain damages as the result of the others' actions." *N. Moore St. Developers, LLC v. Meltzer/Mandl Architects, P.C.*, 23 A.D.3d 27, 799 N.Y.S.2d 485, 488 (1st Dep't 2005) ("*N. Moore St.*") (footnote omitted).

 To be valid, liquidating agreements must meet certain requirements. "Liquidating agreements [under New York law] have three basic elements: (1) the

imposition of liability upon the general contractor for the subcontractor's increased costs, thereby providing the general contractor with a basis for legal action against the owner; (2) a liquidation of liability in the amount of the general contractor's recovery against the owner; and, (3) a provision that provides for the 'pass-through' of that recovery to the subcontractor." *Bovis*, 728 N.Y.S.2d at 27; *see also N. Moore St.*, 799 N.Y.S.2d at 489; *Barry*, 669 N.Y.S.2d at 743. A liquidating agreement must "satisf[y] all three elements," *N. Moore St.*, 799 N.Y.S.2d at 489, and must represent " 'an actual contractual commitment' " by the parties, although this commitment " 'need not take any particular form.' " *Helena Assocs.*, 2008 WL 2117621, at *9 (quoting *Barry*, 669 N.Y.S.2d at 743). Liquidating agreements "may be memorialized in the subcontract or in a separate written agreement and may be assembled from several documents executed over a period of years." *N. Moore St.*, 799 N.Y.S.2d at 490 (citation omitted). Nevertheless, "only an express—as opposed to implied—contractual undertaking to pass through a claim recovery gives rise to a liquidating agreement." *Id.* "Absent a showing of actual contractual liability [running from the prime contrac-

---

**48.** While the example given above is an "upstream" claim by a subcontractor against an owner passing through a general contractor, liquidating agreements may just as readily be used to facilitate "downstream" claims—such as claims by an owner through a general contractor against a subcontractor—or lateral claims—such as claims by a general contractor through an owner against a design professional. *See Menorah Home & Hosp. for the Aged & Infirm v. Fireman's Fund Ins. Co.*, No. 04–CV–3172 (FB)(CLP), 2007 WL 1109079, at *2 (E.D.N.Y.2007) ("*Menorah*") (observing that the "classifications" as to who is the "damaged party," the "intermediary," and the "responsible party" will "vary from case to case"). At least one treatise has noted that

the requirement that a contractor confess liability to its subcontractor for the owner's conduct is curious given *Triangle*'s holding that there can be no liability to admit in the first place. N.Y. Constr. Law Manual §§ 3:22–3:23 (2d ed. 2006); *see Triangle*, 79 N.Y.2d at 802, 580 N.Y.S.2d 171, 588 N.E.2d 69. Nevertheless, courts uphold liquidating agreements even where the intermediary appears to have played no role in causing damage to the injured party. *See Bovis*, 728 N.Y.S.2d at 28 (finding "no apparent reason why [a general contractor] could not have assumed liability" through a liquidating agreement, notwithstanding the subcontract's no-damages-for-delay clause barring such liability).

tor to the subcontractor], there can be no liquidating agreement." *Barry*, 669 N.Y.S.2d at 744; *see also H. Sand & Co., Inc. v. Airtemp Corp.*, 934 F.2d 450, 456 (2d Cir.1991) (noting in this context that "a party may not sue another for its liability to a third party when that liability is merely speculative").

### 1. Crocetti's Impact Claims

Carolina, as assignee of the legal claims of Crocetti,[49] seeks impact damages against DASNY totaling nearly half a million dollars.[50] DASNY asserts that Travelers may not bring claims on behalf of Crocetti because no valid liquidating agreement exists between Trataros and Crocetti. Travelers opposes, arguing that all three required elements of a liquidating agreement are present in the Trataros–Crocetti Subcontract. Carolina has also made separate submissions opposing DASNY's motion for summary judgment.

In arguing that a liquidating agreement exists between Trataros and Crocetti, Travelers and Carolina both rely on three different passages contained in the Trataros–Crocetti Subcontract. None of these provisions constitutes an express admission of liability by Trataros to Crocetti. First, Paragraph 6(d) provides:

> Should the Subcontractor's performance of this Subcontract be delayed, impacted or disrupted by any acts of the Contractor [Trataros], other subcontractors, or the Contractor's suppliers, or delayed,

impacted or disrupted by any acts or causes which would entitle Contractor to an extension of time under the Contract Documents, the Subcontractor shall receive an equitable extension of time for the performance of this Subcontract, but shall not be entitled to any increase in the Subcontract Price or to damages or additional compensation as a consequence of such delays[,] impacts, disruptions, or acceleration resulting therefrom *unless the Owner is liable and pays Contractor for such delays, impacts, disruptions, or acceleration. Contractor will pay the Subcontractor the amount allowed and paid by the Owner for the Subcontractor's delay, impact, disruption or acceleration.* Within five (5) days after the commencement of any delay, impact or disruption, or acceleration caused by *Contractor*, other subcontractors, or the Contractor's suppliers, the Subcontractor shall notify Contractor in writing stating full details of the cause of the alleged delay, impact, disruption or disruptions or acceleration for which the *Owner* [sic] is responsible in sufficient time so that its claim may be timely processed against the Owner [sic].

(Emphasis added). Second, Paragraph 7(b) provides:

> *Subcontractor shall submit in writing any claims for adjustment* in the price, schedule or other provisions of the Sub-

---

**49.** On April 26, 1999, Carolina issued a payment bond and performance bond on behalf of Crocetti guaranteeing the Trataros–Crocetti Subcontract. Crocetti filed for Chapter 11 bankruptcy on or about February 8, 2007. Prior to filing for bankruptcy, Crocetti assigned to Carolina all of its contract payment and delay-damage claims arising out of the Project.

**50.** Specifically, Crocetti seeks loss of productivity in the amount of $369,000.00; premium

time in the amount of $31,291.96; labor and materials escalation in the amount of $26,000.00; and extended overhead in the amount of $17,779.12, for a grand total of $444,071.08. Crocetti has also asserted fourth-party counterclaims against Trataros and Travelers; Carolina indicates that the damages sought on the counterclaims are $333,257.01 in an unpaid contract balance and $123,763.56 in extra work.

contract claimed by Subcontractor *for changes directed by Owner, or for damages for which the Owners [sic] liable,* or as a result of deficiencies or discrepancies in the Contract Documents, *to Contractor* in time to allow Contractor to comply with the applicable provisions of the Contract Documents. *Contractor shall process said claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interests of Subcontractor and others including Contractor.* Subcontract adjustments shall be made only to the extent that Contractor receives relief from or must grant relief to Owner. Further, each Subcontract adjustment shall be equal in laid [sic] Subcontractor's allocable share of any adjustment in Contractor's contract with owner....

(Emphasis added). Finally, Paragraph 9(a) provides:

In case of any dispute between Contractor and Subcontractor, due to any action of Owner or involving the Contract Documents, Subcontractor agrees to be bound to the same extent that Contractor is bound to Owner, by the terms of the Contract Documents .... In case of such dispute, Subcontractor will comply with all provisions of the Contract Documents allowing a reasonable time for contractor to analyze and forward to Owner any required communications or documentation. *Contractor will, at its option (1) present to Owner, in Contractor's name, or (2) authorize Subcontractor to present to Owner, in Contractor's*

*name, all of Subcontractor's claims and answer Owner's claims involving Subcontractor's Work, whenever Contractor is permitted to do so by the terms of the Contract Documents. IF [sic] such dispute is prosecuted or defended by Contractor,* Subcontractor agrees to furnish all documents, statements, witnesses, and other information required, and to pay or reimburse Contractor for all costs, including attorneys' fees, incurred in connection therewith....

(Emphasis added).[51] Carolina and Travelers assert that Paragraph 6(d) constitutes an admission and "liquidat[ion]" of liability by Trataros to Crocetti, and that the other two paragraphs "provide a mechanism for the 'pass-through' to Crocetti" of any recovery made by Trataros and/or "a method for the Subcontractor to make claims [against the Owner] and for the Contractor to prosecute such claims in its own name on behalf of the Subcontractors."

■■■ Travelers has not demonstrated that it has legal standing to assert claims on Crocetti's behalf. As noted, the critical element missing is an admission of liability by Trataros (or Travelers) to Crocetti. Although Paragraph 6(d) of the Subcontract does suggest a "pass-through" of any damages recovered from DASNY by Trataros to Crocetti, that clause does not "impose[ ] liability upon the general contractor for the subcontractor's increased costs." *Barry*, 669 N.Y.S.2d at 743. Instead, Paragraph 6(d) provides only that Crocetti "shall not be entitled to" any damages "unless the Owner is liable and pays Contractor."[52] Similarly, Paragraph 7(b) and

---

**51.** Crocetti's Subcontract is a pre-printed form document prepared by Trataros, but contains various strikethrough edits where the parties bargained to change or omit specific terms.

**52.** By contrast, Travelers' and Trataros' liquidating agreements with LBL and Jordan Pan-

el stipulate, respectively, that "SURETY and/or CONTRACTOR, *acknowledges liability* to SUBCONTRACTOR for SUBCONTRACTOR's claims and does hereby liquidate such liability as hereinafter provided"; and that "SURETY *concedes liability* for subcontractor's claims, and agrees to pursue ... recov-

Paragraph 9(a) reflect *conditional* obligations on the part of Trataros. In Paragraph 7(b), Trataros merely agrees to "process [any] claims" made by Crocetti "for damages for which the Owners [sic] liable" in accordance with the Contract Documents. Likewise, in Paragraph 9(a), Trataros covenants that, if Crocetti wishes to assert a claim against DASNY, Trataros would—at its own option—determine whether to assert that claim in its own name. This conditionality is made clear by the introductory phrase—"IF such dispute is prosecuted or defended by Contractor"—within the final sentence of the excerpt above.[53]

Carolina argues, in opposition, that the Trataros–Crocetti "may not be artfully written," but that it nonetheless "provides that the Subcontractor is entitled to such impact damages as the Contractor may receive from the owner for the impact to Crocetti." That may be so, but a contractual entitlement to funds received by a counterparty from a third party is not the same as an acknowledgment of liability.[54]

Carolina also argues that an implicit admission of liability should be sufficient, relying on *Cayuga Construction Corp. v. United States*, No. 91 Civ. 4883(JFK), 1992 WL 233888, at *3 (S.D.N.Y. Sept. 9, 1992)

("*Cayuga*"). To the extent *Cayuga* overlooked the requirement under New York law that an "express—as opposed to implied—contractual undertaking" is required to create a liquidating agreement, *see N. Moore St.*, 799 N.Y.S.2d at 490, that decision is not persuasive authority. In any event, in *Cayuga*, the court was considering a motion to dismiss based on the statute of limitations. *Cayuga*, 1992 WL 233888, at *3. It therefore addressed whether an implicit admission of liability was sufficient to toll the statute, *not* whether a liquidating agreement sufficed to create legal standing in the general contractor.[55]

In sum, Travelers lacks standing to assert impact claims on Crocetti's behalf, and this aspect of the Pass–Through Claims must be dismissed. Accordingly, the court need not consider the parties' other arguments concerning the legal merit of Crocetti's impact claims or of the possible legal defenses thereto.

### 2. Jordan Panel's Extra Work Claim

Jordan Panel, through Travelers, seeks payment for extra work related to "differing site conditions encountered during Jordan Panel's work at the Project's east-facing exterior facade" (the "Extra Work Claim"). Specifically, due to problems

---

ery of same from the Owner" (emphasis added).

**53.** It is noteworthy that Trataros' Subcontracts with LBL, Jordan Panel, and Brooklyn Welding contain substantially the same three paragraphs as in the Crocetti Subcontract. Travelers does not, however, contend that those provisions suffice as liquidating agreements with respect to LBL, Jordan Panel, and Brooklyn Welding.

**54.** Courts routinely dismiss pass-through claims in the absence of an admission of liability creating a liquidating agreement. *See, e.g., Helena Assocs.*, 2008 WL 2117621, at *10; *Honeywell, Inc. v. J.P. Maguire Co., Inc.*,

No. 93 Civ. 5253(HBP), 2000 WL 307398, at *12–*13 (S.D.N.Y. Mar. 23, 2000); *Port Chester Elec. Constr. Corp. v. HBE Corp.*, No. 86 Civ. 4617(NG), 1995 WL 7974, at *2 (S.D.N.Y. Jan. 10, 1995); *I.T.R.I. Masonry Corp. v. State*, 21 A.D.3d 990, 801 N.Y.S.2d 396, 397 (2d Dep't 2005); *Barry*, 669 N.Y.S.2d at 743–44; *Mars Assocs., Inc. v. N.Y. City Educ. Constr. Fund*, 126 A.D.2d 178, 513 N.Y.S.2d 125, 134 (1st Dep't 1987).

**55.** Carolina also relies on *Schiavone Construction Co., Inc. v. Triborough Bridge & Tunnel Authority*, 209 A.D.2d 598, 619 N.Y.S.2d 117, 118 (2d Dep't 1994), but that case did not concern the question of whether an "implicit" admission of liability would suffice.

with the masonry tolerances on the Project's east elevation, Jordan Panel asserts that it incurred substantial additional costs in order to affix its paneling to the masonry.

 DASNY contends that Jordan Panel failed to comply with a condition precedent present in the General Conditions, which were incorporated into Jordan Panel's subcontract by reference. "[A] condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Presstek*, 12 N.Y.3d at 645, 884 N.Y.S.2d 211, 912 N.E.2d 43 (quoting *Oppenheimer*, 86 N.Y.2d at 690, 636 N.Y.S.2d 734, 660 N.E.2d 415). "Whether a condition precedent exists under the terms of a contract is a matter of law for the court to decide." *Mullany v. Munchkin Enters., Ltd.*, 69 A.D.3d 1271, 893 N.Y.S.2d 714, 717 (3d Dep't 2010). "A contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." *Id.* at 717–18 (citation omitted). A court may "interpret doubtful language as embodying a promise or constructive condition rather than an express condition" in order to reduce "the risk of forfeiture by the obligee," but this option "cannot be employed if the occurrence of the event as a condition is expressed in unmistakable language." [56] *Oppenheimer*, 86 N.Y.2d at 691, 636 N.Y.S.2d 734, 660 N.E.2d 415 (citation omitted). If the court determines that an express condition precedent exists, it must "enforce the will of the parties unless to do so will violate public policy," even if the court "may regret the harsh-

ness of such a condition." *Id.* (citation omitted). "Express conditions must be literally performed; substantial performance will not suffice." *Presstek*, 12 N.Y.3d at 645, 884 N.Y.S.2d 211, 912 N.E.2d 43. Indeed, public policy favors strict enforcement. As explained by the New York Court of Appeals:

> Strong public policy considerations favor scrutiny of claims of bad faith when offered by contractors to excuse noncompliance with notice and reporting requirements in public contracts. These provisions, common in public works projects, provide public agencies with timely notice of deviations from budgeted expenditures or of any supposed malfeasance, and allow them to take early steps to avoid extra or unnecessary expense, make any necessary adjustments, mitigate damages and avoid the waste of public funds. Such provisions are important both to the public fisc and to the integrity of the bidding process.

*A.H.A.*, 92 N.Y.2d at 33–34, 677 N.Y.S.2d 9, 699 N.E.2d 368.

The contract term at issue is General Conditions § 11.01, entitled "Claims for Extra Work." Section 11.01 provides:

> A. *If the Contractor claims that any Work which the Contractor has been ordered to perform will be Extra Work*, or that any action or omission of the Owner is contrary to the terms and provisions of the Contract and will require the Contractor to perform Extra Work *the Contractor shall:*
>
> 1. Promptly comply with said order.
> 2. *File with the Owner within fifteen (15) working days* after being ordered to perform the Work claimed by the Contractor to be Extra Work

---

56. "Forfeiture" is defined as "the denial of compensation that results when the obligee loses its right to the agreed exchange after it has relied substantially, as by preparation or

performance on the expectation of that exchange." *Oppenheimer*, 86 N.Y.2d at 692 n. 2, 636 N.Y.S.2d 734, 660 N.E.2d 415 (citation omitted).

or within fifteen (15) working days after commencing performance of the Work, whichever date shall be earlier, or within fifteen (15) working days after the said action or omission on the part of the Owner occurred, *a written notice of the basis of the Contractor's claim, including estimated cost, and request for a determination thereof.*

3. Proceed diligently, pending and subsequent to the determination of the Owner with respect to any said disputed matter, with the performance of the Work in accordance with all instructions of the Owner.

B. No claim for Extra Work shall be allowed unless the same was done pursuant to a written order of the Owner. *The Contractor's failure to comply with any or all parts of this Article shall be deemed to be:*

1. a conclusive and binding determination on the part of the Contractor that said order, Work, action or omission does not involve Extra Work and is not contrary to the terms and provisions of the Contract[.]

2. *a waiver by the Contractor of all claims for additional compensation or damages as a result of said order, Work, action or omission.*

(Emphasis added).

Section 11.01 constitutes an unambiguous condition precedent to any recovery for extra-work claims and is enforceable as an express condition under New York law. The language of § 11.01(B)(2) clearly mandates that a contractor's failure to follow the process set forth in § 11.01(A) will result in "a waiver by the Contractor of all claims for additional compensation or damages" resulting from the work in question.

■■■ In opposition, Travelers does not dispute that Jordan Panel failed to fully comply with the notice requirement of § 11.01(A)(2). Instead, Travelers argues that "[t]he factual record evidences ample notice provided by Trataros and Jordan Panel" and that such notice is sufficient to satisfy "New York's doctrine of substantial compliance with notice provisions." Travelers cites two cases, *Whitmyer Bros., Inc. v. State of N.Y.*, 63 A.D.2d 103, 406 N.Y.S.2d 617 (3d Dep't 1978) ("*Whitmyer*"), and *Huff Enters., Inc. v. Triborough Bridge & Tunnel Auth.*, 191 A.D.2d 314, 595 N.Y.S.2d 178 (1st Dep't 1993) ("*Huff*"), for the proposition that "when a public owner has been made aware of the contractor's claim that extra work beyond the scope of the contract was being performed, the State has been precluded from insisting upon strict compliance with the notice provisions."

Actual notice or substantial compliance does not suffice. Under New York law, "[e]xpress conditions precedent, which are those agreed to and imposed by the parties themselves, must be literally performed." *Klewin Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc.*, 42 A.D.3d 559, 840 N.Y.S.2d 144, 145 (2d Dep't 2007) (citation omitted); *see also Mezzacappa Bros., Inc. v. City of N.Y.*, 29 A.D.3d 494, 815 N.Y.S.2d 549, 550 (1st Dep't 2006) ("*Mezzacappa*"). *Huff* states that "New York case law recognizes that prompt, written notice requirements in public works contracts serve salutary purposes, and merit strict enforcement." *Huff*, 595 N.Y.S.2d at 181 (citation omitted).[57] New York courts

---

**57.** Contrary to what Travelers implies, *Huff* did not hold that actual notice could excuse strict compliance with contract terms. Rather, *Huff* held that the trial court erred by declining to grant summary judgment for the defendant in a case where the plaintiff had failed to comply with a strict contractual notice provision. 595 N.Y.S.2d at 179–81.

regularly dismiss lawsuits where it is apparent that a contractor seeking extra payment on a contract failed to comply strictly with contractual notice requirements.[58]

*Whitmyer* also does not save the Extra Work claim.[59] That 1978 case belongs to a divergent line of decisions—*see Abax,* 778 N.Y.S.2d at 150; *Vincentis,* 759 N.Y.S.2d at 218; *Amadeus,* 320 N.Y.S.2d at 682—that do not accurately reflect the current state of the law. Even insofar as that line of cases might remain authority for a very narrow exception in "situations where there is an extensive record of *timely* written correspondence and contact between the contractor and agency," *Vincentis,* 759 N.Y.S.2d at 218 (emphasis added), that exception would not be met here. While Travelers asserts that "Jordan Panel initiated a dialogue with TDX well within the fifteen-day time period" following certain extra-work orders given orally on April 28, 2000 and in writing on May 5, 2000, Travelers has not cited any evidence in either its brief or Local Rule 56.1 statement that

would support that naked assertion.[60] Accordingly, the Extra Work Claim must be dismissed.

### 3. Remaining Subcontractors' Impact Claims

With respect to the Pass–Through Claims of the remaining Subcontractors—Brooklyn Welding, LBL, and Jordan Panel[61]—DASNY apparently concedes that valid liquidating agreements were concluded for each Subcontractor and that any conditions precedent were satisfied. Nevertheless, DASNY asserts that summary judgment must be granted as to the remaining Pass–Through Claims for other reasons.

First, the Subcontracts each provide that the "Subcontractor shall assume all obligations, *risks* and responsibilities which Contractor has assumed towards Owner in the Contract Documents" (emphasis added). Those Contract Documents include Contracts 15 and/or 16 as well as the General Conditions, which in

---

**58.** *See Perini Corp. v. City of N.Y.,* 18 F.Supp.2d 287, 293 (S.D.N.Y.1998) (collecting cases); *Dart,* 891 N.Y.S.2d at 77; *Fahs Rolston Paving Corp. v. County of Chemung,* 43 A.D.3d 1192, 841 N.Y.S.2d 404, 406–07 (3d Dep't 2007); *Mezzacappa,* 815 N.Y.S.2d at 549; *Grace,* 802 N.Y.S.2d at 410; *Bat–Jac,* 766 N.Y.S.2d at 352; *Morelli Masons, Inc. v. Peter Scalamandre & Sons, Inc.,* 294 A.D.2d 113, 742 N.Y.S.2d 6, 7 (1st Dep't 2002); *Pettinelli Elec. Co., Inc. v. Bd. of Educ. of City of N.Y.,* 226 A.D.2d 176, 641 N.Y.S.2d 535, 536 (1st Dep't 1996); *Huff,* 595 N.Y.S.2d at 181. *But see Abax, Inc. v. Lehrer McGovern Bovis, Inc.,* 8 A.D.3d 92, 778 N.Y.S.2d 149, 150 (1st Dep't 2004) ("*Abax* "); *G. De Vincentis & Son Constr., Inc. v. City of Oneonta,* 304 A.D.2d 1006, 759 N.Y.S.2d 216, 218 (3d Dep't 2003) ("*Vincentis* "); *Whitmyer,* 406 N.Y.S.2d at 619; *Amadeus, Inc. v. State of N.Y.,* 36 A.D.2d 873, 320 N.Y.S.2d 677, 682 (3d Dep't 1971) ("*Amadeus* ").

**59.** It also appears that the contract notice provision in *Whitmyer* was less strict than that

at issue here. In *Whitmyer,* the court paraphrased the contract's notice requirement as "provid[ing] that if the contractor were of the opinion that if any of the work ordered to be done were extra work, or if it were in violation of the contract, the contractor should promptly notify the superintendent in writing of such objections." 406 N.Y.S.2d at 619. The court did *not* indicate that the contract specified that a failure to provide notice would constitute a waiver, as does General Condition § 11.01(B)(2).

**60.** In particular, Travelers asserts without evidence that this "dialogue" included "a detailed compilation of worksite conditions that required immediate action in order to avoid affecting Jordan Panel's work," and that "[t]hese items were presented and reviewed at a meeting between the parties which was held within the contractually allotted time."

**61.** Aside from the Extra Work claim, Travelers is also bringing delay-damage claims on behalf of Jordan Panel.

turn contain the no-damages-for-delay clause. Thus, DASNY asserts that the no-damages-for-delay clause bars not only Trataros from recovering delay damages, but also the Subcontractors.

Second, DASNY observes that each Subcontract includes further restrictions on the Subcontractors' ability to seek delay or impact damages from Trataros. Paragraph 6(a) of each Subcontract states:

Subcontractor will proceed with the Work in a prompt and diligent manner, in accordance with Contractor's schedule, as reasonably amended from time to time. TIME IS OF THE ESSENCE. Subcontractor shall be entitled to additional compensation for compliance with schedule amendments only to the extent, if any, that the Contract Documents entitle Contractor to reimbursement.

Paragraph 6(d) further provides:

Should the Subcontractor's performance of this Subcontract be delayed, impacted or disrupted by any acts of the Contractor, other subcontractors, or the Contractor's suppliers, or delayed, impacted or disrupted by any acts or causes which would entitle Contractor to an extension of time under the Contract Documents, the Subcontractor shall receive an equitable extension of time for the performance of this Subcontract, *but shall not be entitled* to any increase in the Subcontract Price or to *damages or additional compensation as a consequence of such delays[,] impacts, disruptions, or acceleration resulting therefrom unless the Owner is liable and pays Contractor for such delays, impacts, disruptions, or acceleration.* Contractor will pay the Subcontractor the amount allowed and paid by the Owner for the Subcontractor's delay, impact, disruption or acceleration.

(Emphasis added). A contract appendix, made a part of each Subcontract, provides:

The Subcontractor has visited and carefully examined the project site and is familiar with the existing conditions and difficulties that may affect the execution of own work.... The Subcontractor is cautioned that due to the location of this job he may encounter certain areas of special coordination involving traffic congestion, building access, security requirements, material delivery, etc. *It is understood that the Subcontractor is aware of these conditions and that the Subcontractor will not attempt to seek additional monies for hardships that may arise due to his having to take special measures and precautions regarding the same.*

(Emphasis added). Finally, each Subcontract provides that "[t]he Subcontractor understands that work of this trade may not be continuous and that he may be required to work out of sequence and/or leave a portion of work out due to coordination at the direction of the General Contractor," and that "there shall be no charges for 'comeback time' or out of sequence work."

 The no-damages-for-delay clause in Contracts 15 and 16, as well as the various other Subcontract conditions outlined above, apply to bar the Subcontractors' damage claims against DASNY. In another lawsuit arising out of this Project, the Appellate Division held that General Conditions § 11.02 applied to subcontractors' delay claims against DASNY. *See Universal/MMEC*, 856 N.Y.S.2d at 561. Indeed, Travelers, sued in its capacity as surety to Trataros, successfully obtained dismissal of a state-court lawsuit by a roofing subcontractor based on the Paragraph 6(d) no-damages-for-delay provision. *See Premier*, 2008 WL 2676800, at *4–*5. The reasoning applied in the other two Project lawsuits, *Universal/MMEC* and *Premier*, also governs here.

Travelers makes two main arguments in opposition. First, Travelers relies on the same assertions that it made with respect to the Impact Claim by Trataros, including that the "uncontemplated delay" or "gross negligence" exceptions apply and/or that DASNY waived the no-damages-for-delay clause through its conduct. In particular, Travelers asserts that, because Jordan Panel repeatedly warned TDX and KPF about certain design flaws to no avail, DASNY's supposed acquiescence thereafter "rises to the level of gross negligence and reckless indifference" and precludes enforcement of the no-damages-for-delay clause with respect to claims by Jordan Panel and LBL.

Travelers' evidence is as follows. First, Travelers relies on findings made by a DASNY expert, Warner Construction Consultants ("Warner"), that KPF or its subconsultants were responsible for a 187–day delay to the start of Jordan Panel's and LBL's work on the Project's exterior. Warner found that this delay "was caused by the extended period of time taken to resolve a design conflict between the specified milling, fabrication, and erection tolerances for the tubular structural steel girts and the exterior metal panel and glazing systems" (the "Girt Tolerance Issue"). Warner opined that the Girt Tolerance Issue "made it impossible to build the exterior walls as shown in the plans and specifications." Travelers also relies on evidence from another DASNY expert, Wiss, Janney, Elstner Associates, Inc. ("WJE"), who opined that KPF's and its subconsultants' "fail[ures] to properly co-ordinate the specified tolerances for the profiled metal panel system with the specified tolerances for the supporting structural steel girts" constituted professional negligence. Travelers contends that KPF's "malpractice" with respect to the Girt Tolerance Issue "*alone* constitute[s] sufficient grounds to deny DASNY's motion." Nevertheless, Travelers also asserts that the Girt Tolerance Issue is "merely the tip of the iceberg with respect to the impacts to Contract 15 and 16." [62]

■ Travelers' argument that the no-damages-for-delay clause does not apply is without merit. The factual evidence tendered by Travelers simply does not rise to the level of creating a triable issue as to whether the delays suffered by the Subcontractors were "uncontemplated." *Corinno*, 67 N.Y.2d at 309, 502 N.Y.S.2d 681, 493 N.E.2d 905.[63] Likewise, neither Warner's and WJE's expert opinions regarding KPF's negligent design, nor Travelers' evidence that Jordan Panel "repeatedly highlighted [the Girt Tolerance Issue] in correspondence and meetings" with TDX and KPF, amounts to evidence of conduct that "smacks of intentional wrongdoing," suggests a "sinister intention," or "betokens a reckless indifference to the rights of others." *Kalisch–Jarcho*, 58 N.Y.2d at 385, 461 N.Y.S.2d 746, 448 N.E.2d 413; *see also* *A.H.A.*, 92 N.Y.2d at 31, 677 N.Y.S.2d 9, 699 N.E.2d 368. Thus, Travelers has also failed to show that DASNY's handling of the Girt Tolerance Issue raises a triable question with respect to the "gross negligence" exception. Finally, contrary to

---

**62.** The rest of the "iceberg," as it were, is never described with any specificity, but is discussed in the context of Trataros' Impact Claim in Section I.A.2 above.

**63.** For example, Travelers appears to ascribe some of the blame for the tolerance problems encountered by Jordan Panel at the Project's east elevation to the masonry prime contrac-

tor. But General Conditions § 13.01 clearly contemplates the possibility that contractors could "sustain [ ] damage" as a result of "an[ ] act or omission of [an]other contractor," and that clause explicitly allocates the risk of such damage to contractors by providing that "the Contractor shall have no claim against the Owner for said damage."

Travelers' implied assertions, the fact that Trataros was contractually required to rely upon KPF's plans and specifications is not, standing alone, a defense to enforcement of the no-damages-for-delay clause.

■ Travelers' second, broader argument opposing summary judgment on the Pass–Through Claims is that the "exculpatory clauses contained in Trataros' subcontracts" can no longer be enforced. Travelers contends that by concluding a liquidating agreement with each of the Subcontractors, Travelers admitted liability and thereby "waiv[ed] the subcontract provisions on which DASNY relies," such that the no-damages-for-delay clause does not apply. This argument is without merit.[64] Even if the admission of liability by Travelers or Trataros to the Subcontractors represented a waiver of all rights held by Trataros (and Travelers) under the Subcontracts, it cannot waive DASNY's rights or defenses under Contracts 15 and 16, which are separate contracts. Insofar as the Subcontractors' rights of recovery under the Pass–Through Claims necessarily rely upon Trataros' rights under Contracts 15 and 16, DASNY is entitled to assert the no-damages-for-delay clause of those Contracts against Travelers, the Subcontractors, or whoever else might be standing in Trataros' shoes. As such, the Pass–Through Claims must be dismissed.

## C. Travelers' Bond Losses Claim

Finally, DASNY also seeks dismissal of Travelers' Bond Losses Claim. Although

that claim is inartfully pleaded in the Complaint, Travelers explains in its opposition to DASNY's motion that the claim seeks to recover "[s]ubstantial attorneys fees and expenses [that] were incurred in the defense of the prior law suits which involved subcontractors suing both Travelers and Trataros ... seeking to recover damages due to delay based on negligence and/or of breaches in connection with the Project and/or DASNY's failure to make payment."[65] These "prior law suits" were, apparently, lawsuits brought by subcontractors seeking relief under the Payment Bonds. Travelers' claim is based on the exception to the American Rule recognized in *Shindler v. Lamb*, 25 Misc.2d 810, 211 N.Y.S.2d 762 (Sup.Ct. N.Y. County 1959), which provides that "[i]f, through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred." *Id.* at 765; *accord Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2d Cir.1986).

■ Travelers' Bond Losses Claim cannot succeed because it is barred by exculpatory language in the Payment Bonds. Paragraph 2 of each Payment Bond provides:

> The above named Principal and Surety hereby jointly and severally agree with

---

64. With respect to Crocetti, Travelers' argument is wholly illogical. The "liquidating agreement" that Trataros claims was concluded with Crocetti is contained in the very Subcontract whose no-damage provisions Travelers is now claiming were waived by virtue of concluding the liquidating agreement.

65. Both Travelers and DASNY purport to incorporate by reference various arguments

made in briefing on other motions. Travelers' arguments regarding the Bond Losses Claim are actually contained in its opposition to KPF's motion for summary judgment. Travelers also sought to recover its "bond losses" from KPF and TDX, but those claims were dismissed. *See August 11 Opinion*, 734 F.Supp.2d at 385, 388, 2010 WL 3199861, at *13, *15.

the Owner that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. *The Owner shall not be liable for the payment of any costs or expenses of any such suit.*

(Emphasis added). The language above clearly provides that DASNY "shall not be liable for the payment of any costs or expenses" resulting from the litigation underlying the Payment Bond claims. Travelers does not proffer any authority suggesting that this provision should not be enforced in accordance with its clear and unambiguous terms. Accordingly, the Bond Losses Claim is dismissed.

## II. DASNY's Counterclaims Against Travelers

Travelers, while opposing summary judgment on its own claims against DASNY, seeks summary judgment in its favor with respect to DASNY's three Counterclaims against it. For the following reasons, two of the Counterclaims are dismissed, while the third requires trial.

### A. DASNY's Breach-of-Contract Counterclaim

DASNY's second counterclaim, the Breach-of-Contract Counterclaim, asserts that Travelers is liable for Trataros' alleged breaches of Contracts 15 and 16

"[b]y virtue of Travelers' assumption of Trataros' obligations" under those Contracts. Travelers seeks dismissal of this counterclaim, asserting that Travelers did not "assume" Trataros' contractual obligations and therefore cannot be liable on those Contracts.

■■■ " 'It goes without saying that a contract cannot bind a nonparty.' " *Davis v. Blige,* 505 F.3d 90, 103 (2d Cir.2007) (quoting *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002)). "As a general rule, privity or its equivalent remains the predicate for imposing liability for nonperformance of contractual obligations." *Smith v. Fitzsimmons,* 180 A.D.2d 177, 584 N.Y.S.2d 692, 695 (4th Dep't 1992). An exception to this rule exists, however, where a nonparty "manifests an intent to be bound by the contract," *Horsehead Indus., Inc. v. Metallgesellschaft AG,* 239 A.D.2d 171, 657 N.Y.S.2d 632, 633 (1st Dep't 1997) (*"Horsehead"*), for instance, by "accept[ing] the written agreement and [ ] act[ing] upon it." *Argo Marine Sys., Inc. v. Camar Corp.,* 755 F.2d 1006, 1011 (2d Cir.1985) (citation omitted).

DASNY does not dispute that Travelers never entered into a "takeover agreement" with Trataros and DASNY with respect to the Project.[66] DASNY's theory that Travelers "assumed" the Contracts depends instead on the Financing Agreement concluded between Travelers and Trataros on or about June 19, 2002. Pursuant to the Financing Agreement, Travelers provided financing to Trataros while also imposing

---

**66.** "Takeover agreements" are contracts in which a surety explicitly assumes the performance obligations of its principal under the latter's contract with the obligee. *See, e.g., Kemper Ins. Cos. v. State,* 70 A.D.3d 192, 892 N.Y.S.2d 596, 597–98 (3d Dep't 2009); *In*

*re Int'l Fid. Ins. Co.,* 236 A.D.2d 719, 653 N.Y.S.2d 729, 730 (3d Dep't 1997). Takeover agreements generally occur after an obligee has declared a contractor in default under a performance bond, thereby triggering a surety's obligation to complete the contract.

certain conditions on Trataros' business.[67] Among other things, according to DASNY, Travelers required Trataros to deposit all funds it received from any project (not just the Project) into the Joint Account created by Travelers. No funds could be paid out of the Joint Account without the signature of a Travelers representative. DASNY further asserts that Travelers' role in investigating problems with the epoxy terrazzo flooring at the Project "evidence[d] a course of conduct whereby Trataros and Travelers agreed that Travelers would take over Trataros' obligations." [68]

▬▬▬ The fact that Travelers and Trataros entered into the Financing Agreement does not raise a triable issue of fact as to whether Travelers assumed Trataros' obligations under the Contracts. Courts facing similar fact patterns have held that a surety's provision of financing to its contractor principal does not expand the surety's obligations to the obligee beyond the penal sum of the bond or, absent compliance with conditions precedent in the bond, make the surety liable for performance of the principal's contracts. *See U.S. ex rel. Maris Equip. Co., Inc. v. Morganti, Inc.*, 163 F.Supp.2d 174, 193–95 (E.D.N.Y.2001) ("*Morganti*"); *John G. Lambros Co., Inc. v. Aetna Cas. & Sur. Co.*, 468 F.Supp. 624, 628 (S.D.N.Y.1979)

("*Lambros*"). In *Lambros*, Judge Weinfeld observed that "[i]t is not unusual for either a surety or secured creditor … to become intimately involved in the debtor's financial affairs," and "[s]uch involvement does not 'merge' the identities of the creditor and debtor … nor does it expose the creditor to contract liability on obligations of its debtor other than those it has agreed to assume." *Lambros*, 468 F.Supp. at 628 (citation omitted). Thus, "even when a surety advances large sums of money to the contractor and becomes 'intimately involved' in the contractor's financial affairs, the surety will not, without more, face exposure beyond the parameters of its bond." [69] *Morganti*, 163 F.Supp.2d at 194 (quoting *Lambros*, 468 F.Supp. at 628).[70]

DASNY also asserts that it can recover for breach of contract because "New York law clearly allows for the imposition of liability on a corporation that completely controlled and dominated another corporation for the liabilities of that other corporation, thereby causing an injury to a third party." This argument invokes a theory of "piercing the corporate veil" or "alter ego" liability. *See, e.g., Babitt v. Citibank, N.A. (In re Vebeliunas)*, 332 F.3d 85, 90–92 (2d Cir.2003) (discussing New York law on alter-ego liability); *accord Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d

---

67. The parties dispute whether the funding provided by Travelers to Trataros pursuant to the Financing Agreement was "limited," as Travelers asserts, or "significant," as DASNY asserts.

68. For a description of the alleged flooring failure, *see July 30 Opinion*, 732 F.Supp.2d at 351–54, 2010 WL 3001729, at *2–*4.

69. Nor does DASNY's allegation that "[a]fter Trataros went out of business, Travelers took actions to give the impression that Trataros was still in existence," suggest in any way that Travelers outwardly "manifest[ed] an intent to be bound" by Trataros' obligations

under Contracts 15 and 16. *Horsehead*, 657 N.Y.S.2d at 633.

70. DASNY attempts to distinguish *Lambros* and *Morganti* by asserting that it has "presented a large volume of facts … that demonstrate that the relationship between Travelers and Trataros went far beyond the Financing Agreement." DASNY has not, however, pointed to evidence that raises a question of fact whether Travelers manifested an intention to be bound by, or that it otherwise assumed, Trataros' legal obligations under Contracts 15 and 16. Instead, this evidence is relevant, if at all, to DASNY's unpleaded alter-ego claim.

135, 140–42, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993).

■■■ DASNY may not resist summary judgment by relying on an alter-ego theory. As a threshold matter, DASNY did not plead its alter-ego theory in its Counterclaims nor interpose it as an affirmative defense, and DASNY has also never sought leave to amend its pleadings to assert it. "[T]he central purpose of a complaint is to provide the [opposing party] with notice of the claims asserted against it." *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir.2006). Because DASNY did not give notice of this claim to Travelers in its pleadings, DASNY may not raise it for the first time in opposing Travelers' motion for summary judgment.[71] "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 24 (1st Cir.1990).

■■■ Second, even if DASNY were to move for leave to amend its Counterclaims, the motion would now be denied. The cutoff for amendment of pleadings, established by the Court as required by the Federal Rules of Civil Procedure, was February 1, 2008.[72] Under Rule 16, "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R.Civ.P. 16; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 267 (2d Cir.2009). Aside from "good cause," the district court may also consider "in the exercise of its discretion under Rule 16(b) ... other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 244. "Undue prejudice arises," *inter alia*, "when an amendment comes on the eve of trial and would result in new problems of proof" or when it would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial." *Ruotolo v. City of N.Y.*, 514 F.3d 184, 192 (2d Cir.2008) (citation omitted); *see also O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 70 (2d Cir.2002); *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir.2000).

DASNY has not explained its failure to plead the alter-ego claim, nor has it attempted to demonstrate the existence of diligence supporting "good cause" for permitting those claims to be asserted now.[73] Moreover, to permit DASNY leave to amend and plead an alter—ego claim at this juncture-on the eve of trial, following several years of costly fact and expert

71. DASNY's allegation that Travelers "assumed" the Contracts does not suffice as notice to Travelers that DASNY would rely on an alter-ego theory. *See, e.g., Scully v. U.S. WATS, Inc.*, 238 F.3d 497, 515 (3d Cir.2001) (issue of alter-ego liability not properly before the court where "plaintiffs never raised an alter ego liability theory in the initial pleadings or at any point during pretrial proceedings"). Moreover, as Travelers observes, DASNY's pleadings do not contain any words or phrases that would invoke even obliquely an argument that Travelers dominated or controlled Trataros' corporate form.

72. Under the Federal Rules, the mandatory Rule 16 scheduling order *"must* limit the time to join other parties [and] amend the pleadings." Fed.R.Civ.P. 16(b)(3)(A) (emphasis added). Rule 16 is thus designed to "assure[ ] that at some point both the parties and the pleadings will be fixed." *Kassner v. 2d Ave. Deli. Inc.*, 496 F.3d 229, 243 (2d Cir.2007) (citation omitted).

73. With respect to the question of DASNY's diligence, Travelers observes that, as of April 2010, DASNY had been in possession of the evidence relied upon to support its alter-ego claim for at least 14 months, but did not act during that time to pursue amendment.

discovery [74]—would, as Travelers observes, cause it substantial prejudice. Accordingly, DASNY may not pursue its alter-ego theory in this case, and the Breach-of-Contract Counterclaim must be dismissed.

## B. DASNY's Performance Bond Counterclaim

The third counterclaim, the Performance Bond Counterclaim, asserts that Travelers "wrongfully rejected" DASNY's demand for payment under the Performance Bonds. Travelers responds that the Performance Bond Counterclaim must be dismissed because DASNY has failed to comply with the conditions precedent to Travelers' obligations under the Performance Bonds.

"In New York, a bond is a contract[,] and [a court] therefore 'look[s] to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond.'" *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 n. 4 (2d Cir.2009) ("*Arch*") (quoting *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 51 (2d Cir.2004) ("*Braspetro*")); *see also Walter Concrete Constr. Corp. v. Lederle Labs.*, 99 N.Y.2d 603, 605, 758 N.Y.S.2d 260, 788 N.E.2d 609 (2003) ("*Walter Concrete*"). "Surety bonds, like all contracts, are to be fairly construed so as to effectuate the intent of the parties as it has been expressed in the terms of the contract." *Arch*, 584 F.3d at 39 n. 4 (citation omitted); *accord Gillies v. Nat'l*

*Fire Ins. Co. of Hartford*, 56 A.D.3d 1236, 867 N.Y.S.2d 295, 296 (4th Dep't 2008). "Where the terms are unambiguous, interpretation of the surety bond is a question of law." *Caravousanos v. Kings County Hosp.*, 74 A.D.3d 716, 904 N.Y.S.2d 444, 446 (2d Dep't 2010) (citation omitted).

Surety bonds issued by commercial surety companies are not construed strictly. "[W]hile the liability of a surety cannot be extended beyond the plain and explicit language of the contract, a surety is not entitled to any particular tenderness in the interpretation of the language of his contract." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir.1999) (citation omitted). "[T]he status of a 'favorite of the law' once enjoyed by the surety, at a time when most suretyship obligations were uncompensated, is clearly a thing of the past." *Braspetro*, 369 F.3d at 51 (citation omitted). Indeed, "[w]here a compensated surety has assured a standard form of bond, it is to be interpreted liberally, and all ambiguities are to be resolved in favor of those for whose benefit the bond is given." *Rich v. N. Am. Specialty Ins. Co.*, 26 A.D.3d 237, 809 N.Y.S.2d 68, 69 (1st Dep't 2006) (citation omitted).[75]

"'[B]efore a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent.'" *Elm Haven Constr. Ltd. P'ship v. Neri Constr. LLC*, 376 F.3d 96, 100 (2d Cir.

---

74. Non-expert fact discovery ended in early 2009. In a reply declaration, Travelers' counsel attests that, since February 2008, the parties have taken 76 days of fact and expert witness depositions and exchanged 26 expert reports.

75. Travelers' repeated invocation of the "strictissimi juris" standard is inappropriate. "The rule of strictissimi juris is not rigidly to be applied in the case of a compensated sure-

ty on a construction contract under … New York law." *Hunt v. Bankers & Shippers Ins. Co. of N.Y.*, 60 A.D.2d 781, 400 N.Y.S.2d 645, 647 (4th Dep't 1977). It is for an "uncompensated surety" that the bond obligation "is construed strictissimi juris in the surety's favor." *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 30 A.D.3d 1, 811 N.Y.S.2d 47, 59 (1st Dep't 2006) (citation omitted).

2004) ("*Elm Haven*") (quoting *Braspetro*, 369 F.3d at 51). Here, the Performance Bonds contain several conditions precedent to Travelers' obligations under the Bonds. The Performance Bonds for Contracts 15 and 16, issued using form language prepared by DASNY, each provide:

2. If there is no Owner default, *the Surety's obligation under this Bond shall arise after:*

 2.1 *The Owner has notified the Contractor,* the Surety [sic] at its address described in Paragraph 8. below *that the Owner is considering declaring a Contractor in default.*

 2.2 *The Owner has declared a Contractor in default and formally terminated the Contractor's right to complete the Contract.*

 2.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Contract or to a Contractor selected to perform the Contract in accordance with the terms of the Contract with the Owner.

(Emphasis added). The above three paragraphs are common conditions of performance bonds which, as Travelers observes, resemble the conditions included in the standard American Institute of Architects 312 ("AIA 312") Performance Bond. *See Braspetro*, 369 F.3d at 41; *Walter Concrete*, 99 N.Y.2d at 605, 758 N.Y.S.2d 260, 788 N.E.2d 609 (noting that the AIA–312 bond requires "a declaration of default" before the surety is liable, while the AIA–311 bond does not); *120 Greenwich Dev. Assocs., LLC v. Reliance Ins. Co.*, No. 01 Civ. 8219(PKL), 2004 WL 1277998, at *1, *12 (S.D.N.Y. June 8, 2004) ("*120 Greenwich*") (interpreting an AIA–312 bond and determining that it contains express condi-

tions precedent); *see also* N.Y. Jur.2d Bonds §§ 44, 105 (discussing conditions precedent within surety bonds).

■ DASNY does not dispute that it never declared Trataros in default with respect to either Contract 15 or Contract 16.[76] The conditions precedent of the Performance Bonds are set forth in "unmistakable language of condition," and as "express conditions," they "must be literally performed." *Presstek*, 12 N.Y.3d at 645, 884 N.Y.S.2d 211, 912 N.E.2d 43 (citation omitted). Accordingly, having failed to comply with the conditions precedent, DASNY may not compel Travelers to act under the Performance Bonds. *Cf., e.g., Elm Haven*, 376 F.3d at 100; *120 Greenwich*, 2004 WL 1277998, at *13; *153 Hudson Dev., LLC v. DiNunno*, 8 A.D.3d 77, 778 N.Y.S.2d 482, 483 (1st Dep't 2004).

■ In opposition, DASNY argues that "Travelers may not escape liability to DASNY … by relying upon an alleged failure by DASNY to satisfy conditions precedent when Travelers itself caused the alleged failure." While it is true that "a party cannot insist upon a condition precedent, when its non-performance has been caused by himself," *A.H.A.*, 92 N.Y.2d at 31, 677 N.Y.S.2d 9, 699 N.E.2d 368 (citation omitted), DASNY has not tendered any evidence to show that Travelers caused DASNY to fail to comply with the Performance Bonds' notice provisions. Moreover, to the extent that DASNY indicates that the basis for its equitable argument was "discussed at length" in the section of its brief devoted to the Breach–of–Contract Counterclaim, DASNY may not rely on its unpleaded alter-ego theory in order to excuse its noncompliance with the bonds' conditions precedent. Accordingly,

---

**76.** It is also undisputed that DASNY never terminated Contract 15 or Contract 16 through the processes provided by General

Conditions § 10.01 ("Termination for Cause") or § 10.02 ("Termination for Convenience of Owner").

DASNY's Performance Bond counterclaim is dismissed.

## C. DASNY's Payment Bond Counterclaim

The first counterclaim, and the final one to be addressed in this Opinion, alleges that Travelers breached its obligations under the Payment Bonds to compensate various subcontractors whom Trataros failed to pay. DASNY further contends that some of Trataros' subcontractors filed mechanics' liens on the Project and subsequently sued DASNY to foreclose on those liens, with the result that DASNY was compelled through a settlement process accompanying that litigation to make payments that should have been made by Travelers.

■ A payment bond is an undertaking whereby a surety guarantees to an obligee that all bills for labor and materials contracted for, and actually used by the contractor, will be paid by the surety if the contractor defaults. N.Y. Jur.2d Bonds § 61. Payment bonds "work like insurance policies designed to guarantee payment to the general contractors' suppliers, employees and subcontractors." *Quantum Corp. Funding, Ltd. v. Westway Indus., Inc.*, 4 N.Y.3d 211, 214, 791 N.Y.S.2d 876, 825 N.E.2d 117 (2005) (*"Quantum"*).

Travelers seeks summary judgment on the theory that DASNY is not a proper "claimant" under the Payment Bonds and that DASNY lacks standing to assert a claim for their breach. The Payment Bonds accompanying Contracts 15 and 16 provide:

1. *A claimant is defined as one having a direct Contract with the Principal or with a Subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Contract* . . . .

2. The above named Principal and Surety hereby jointly and severally agree with the Owner that *every claimant as herein defined,* who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, *may sue on this bond for the use of such claimant,* prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Owner shall not be liable for the payment of any costs or expenses of any such suit.

(Emphasis added). Travelers further contends that any payments made by DASNY to subcontractors were made voluntarily, such that DASNY cannot avail itself of the doctrine of equitable subrogation to seek reimbursement from Travelers.

The Payment Bonds issued in connection with Contracts 15 and 16 were "statutory" bonds required by New York law. A consideration of the Payment Bond Counterclaim requires an understanding of the purpose of statutory payment bonds as well as an examination of when, if ever, an owner-obligee has legal standing to sue for damages under such bonds.

### 1. Payment Bonds Under New York Law

■ New York State Finance Law § 137 provides that, for any "contract for the prosecution of a public improvement for . . . a public benefit corporation," a condition to the approval of such contract is "a bond guaranteeing prompt payment of moneys due to all persons furnishing labor or materials to the contractor or any subcontractors in the prosecution of the

work provided for in such contract." N.Y. State Fin. Law § 137(1).[77] Therefore, "issuance of a labor and material payment bond is mandatory on public improvement projects for, *inter alia,* public benefit corporations such as [ ] DASNY." *Harsco,* 752 N.Y.S.2d at 62. "A bond on a public improvement project ... is deemed issued pursuant to Section 137 and subject to its provisions even where, as here, it does not specifically refer to the State Finance Law." *Morin v. Empiyah & Co., LLC,* 389 F.Supp.2d 506, 512 n. 7 (S.D.N.Y.2005); *accord A.C. Legnetto Const., Inc. v. Hartford Fire Ins. Co.,* 92 N.Y.2d 275, 278, 680 N.Y.S.2d 45, 702 N.E.2d 830 (1998).

Section 137 also provides a private right of action to subcontractors and suppliers on public improvement projects who are not promptly paid by the hiring contractor:

> *Every person who has furnished labor or material,* to the contractor or to a subcontractor of the contractor, in the prosecution of the work provided for in the contract *and who has not been paid in full therefor* before the expiration of a period of ninety days after the day on which the last of the labor was performed or material was furnished by him for which the claim is made, *shall have the right to sue on such payment bond in his own name for the amount, or the balance thereof, unpaid at the time of commencement of the action....*

N.Y. State Fin. Law § 137(3). The statute provides a one-year statute of limitations for any "action on a payment bond furnished pursuant to this section," which begins to run on "the date on which final payment under the claimant's subcontract became due." [78] N.Y. State Fin. Law § 137(4)(b).

Courts have identified at least two main purposes for the statutory bonding requirement. First, it evidences a legislative intent to benefit and protect subcontractors and suppliers. *See Spanos Painting Contractors, Inc. v. Union Bldg. & Constr. Corp.,* 334 F.2d 457, 459 (2d Cir.1964); *Quantum,* 4 N.Y.3d at 216, 791 N.Y.S.2d 876, 825 N.E.2d 117; *Davidson Pipe Supply Co., Inc. v. Wyoming County Indus. Dev. Agency,* 85 N.Y.2d 281, 285, 624 N.Y.S.2d 92, 648 N.E.2d 468 (1995); *Harsco,* 752 N.Y.S.2d at 62. Second, § 137 protects the State, as owner, as well. Acknowledging that the "interests protected by performance bonds are very different from those protected by payment bonds," the Second Circuit noted that "the utility of a payment bond" is the role it plays in helping "maintain[ ] the [owner's] property free of any mechanics' liens by unpaid materialmen, suppliers, or laborers." *Braspetro,* 369 F.3d at 69; *see also HNC Realty Co. v. Bay View Towers Apts., Inc.,* 64 A.D.2d 417, 409 N.Y.S.2d 774, 779 (2d Dep't 1978). The New York Court of Appeals likewise observed that "[a]n additional purpose" of § 137 at the time of its enactment was to "reduce the cost of state

**77.** New York State Finance Law § 137 was first passed in 1938, *Quantum,* 4 N.Y.3d at 215, 791 N.Y.S.2d 876, 825 N.E.2d 117, and was "modeled on the Federal Miller Act [of 1935], which requires a prime contractor on a Federal project to furnish a bond to insure payment to those who supply labor and material for the project." *Harsco Corp. v. Gripon Const. Corp.,* 301 A.D.2d 90, 752 N.Y.S.2d 59, 63 (2d Dep't 2002) (*"Harsco "*). The Miller Act in turn was intended to "provide[ ] an alternative remedy to the mechanic's lien,"
which is a remedy not available under federal projects "because a lien cannot attach to [federal] government property." *Id.* In New York, however, mechanics' liens are available to subcontractors on public improvement projects, and thus § 137 is not the sole remedy available for unpaid subcontractors and suppliers. *See* N.Y. Lien Law § 5.

**78.** Travelers does not contend that the Payment Bond claim is untimely.

projects by encouraging lower-cost bids from contractors." *Quantum*, 4 N.Y.3d at 215, 791 N.Y.S.2d 876, 825 N.E.2d 117; *see also* N.Y. Constr. Law Manual § 8:32 (describing the purpose of payment bonds as "protect[ing] the obligee against the claims of unpaid parties" as well as "facilitat[ing] payment for labor done and materials furnished for an improvement").

### 2. General Principles of Obligee Standing

■ Before turning to the resolution of the Payment Bond claim under New York law, it is useful to review relevant common law principles. In the traditional scenario—wherein a general contractor is required to procure a payment bond to satisfy payment claims for labor or materials supplied by the general contractor's subcontractors—the project's owner is the obligee (the "owner-obligee").[79] Despite assuming this special status, however, the owner-obligee may generally not recover damages from the surety under the payment bond, as the bond is intended to provide payment to persons supplying labor and material to the contractor, not to provide a financial recovery to the owner-obligee. Numerous courts have denied recovery to an owner-obligee under a payment bond, or at least observed that "the caselaw generally disfavors" such a suit. *Fed. Ins. Co. v. Me. Yankee Atomic Power Co.*, 183 F.Supp.2d 76, 81 (D.Me.2001) ("*Maine Yankee*") (collecting cases). Indeed, even where an owner-obligee itself purchases labor and materials in order to complete a contract after a contractor's default, the obligee may not make a claim upon the contractor's payment bond in order to recover those costs, because the obligee is not a subcontractor or supplier

within the meaning of the payment bond. *See* 11 Couch on Insurance § 165:15.

Nonetheless, an owner-obligee is not always foreclosed from claiming against a surety under a payment bond. The fact pattern at bar—with DASNY seeking what is, essentially, indemnification from Travelers for payments it made to Trataros' subcontractors, after Travelers refused to pay them, and after some of those subcontractors asserted mechanics' liens against DASNY—is one in which some courts have permitted recovery by obligees under a payment bond. *See, e.g., Hayle Floor Covering, Inc. v. First Minn. Constr. Co.*, 253 N.W.2d 809, 813–14 (Minn.1977); *Tropic Builders, Ltd. v. United States*, 52 Haw. 298, 475 P.2d 362, 366 (1970); *Maine Yankee*, 183 F.Supp.2d at 86. Treatises that have considered the question of obligee standing under payment bonds have also endorsed the obligee's right of recovery in situations like those at issue here. "[T]he obligee has no right [on a payment bond] with respect to the claims of laborers and materialmen, *unless, through payment, he has become subrogated to their claims.*" 11 Couch on Insurance § 165:14 (emphasis added); *see also id.* § 165:24. Indeed, Couch concludes that "where a ... [payment bond] claimant who is not paid files a mechanics' lien attaching to the owner's property, the bond *implies an obligation on the part of the surety to indemnify the owner* so that the property will be free of the lien." *Id.* § 165:14 (emphasis added); *see also* 17 Am.Jur.2d Contractor's Bonds § 10 (same). Bruner & O'Connor concludes that "[t]he class of protected persons under a payment bond excludes the owner, even though the owner is named as the nominal bond obligee, [as well as] co-prime

---

**79.** "[A] surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third

party obligee." *Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1304 (Fed.Cir.2007) (citation omitted).

contractors and lenders, *unless they are assignees of the claims of otherwise protected claimants.*" 3 Bruner & O'Connor on Construction Law § 8:163 (emphasis added); *see also id.* (collecting cases finding the existence of "equitable" assignments).

Even those courts that deny recovery to an obligee seeking remuneration under a payment bond often observe that the outcome depended, in part, on the fact that exceptional circumstances did not exist. In *Elm Haven*, the Second Circuit, applying Connecticut law, held that summary judgment was "properly granted against [the obligee] on its Payment Bond claim" because the obligee was neither a "claimant" under the bond, nor "was [it] assigned the rights of any claimant." *Elm Haven*, 376 F.3d at 101. Similarly, in a recent case in Massachusetts, the court denied an owner-obligee's claim against a payment bond surety, but distinguished the foregoing treatise authorities by observing "[t]here [was] no evidence or claim of subrogation presented in this case." *American Mfrs. Mut. Ins. Co. v. Sherborn Meadows, LLC,* No. 07–11711–DPW, 2008 WL 5396479, at *6 (D.Mass. Dec. 22, 2008). As a final example, in *Goodbys Creek, LLC v. Arch Insurance Co.* ("*Goodbys*"), the court rejected an owner-obligee's payment bond claim because the obligee had not shown that it had been forced to pay any of the subcontractors.[80] *Goodbys,* No. 07–cv–947–J–33HTS, 2008 WL 2950112, at *3 (M.D.Fla. July 31, 2008).

### 3. Obligee Standing Under New York Law

 With the foregoing principles in mind, the Court turns to consider the question under New York law. "[The] role [of] a federal court sitting in diversity is not to adopt innovative theories that may distort established state law." *Runner v. N.Y. Stock Exch., Inc.,* 568 F.3d 383, 386 (2d Cir.2009) (citation omitted). Where a federal court encounters an issue that has not yet been decided by the relevant state's law, the court "must carefully predict how the state's highest court would resolve the uncertainties that [the court has] identified." *Id.* (citation omitted). "In making this prediction, [the court] give[s] the fullest weight to pronouncements of the state's highest court while giving proper regard to relevant rulings of the state's lower courts." *Id.* (citation omitted).

 There are several reasons to conclude that New York law would recognize the standing of an owner-obligee to sue under a payment bond employing a subrogation theory. First, New York law recognizes a "broad" doctrine of equitable subrogation. *Broadway Houston Mack Dev., LLC v. Kohl,* 71 A.D.3d 937, 897 N.Y.S.2d 505, 506 (2d Dep't 2010) ("*Broadway*"). The doctrine of subrogation applies " 'to cases where a party is compelled to pay the debt of a third person to protect his own rights, or to save his own property.' " *Id.* (quoting *Gerseta Corp. v. Equitable Trust Co. of N.Y.,* 241 N.Y. 418, 426, 150 N.E. 501 (1926)). The purpose of subrogation is "to shift a debt or obligation to a party who more properly should be accountable in order to prevent unjust enrichment and an unfair result." *Hytko v. Hennessey,* 62 A.D.3d 1081, 879 N.Y.S.2d 595, 600 (3d Dep't 2009); *see also Allstate Ins. Co. v. Mazzola,* 175 F.3d 255, 258 (2d Cir.1999).

---

**80.** The obligee's theory of harm in *Goodbys* was not that the surety had *failed* to pay subcontractors under the payment bond, but rather, that the surety had "*wrongfully paid* every subcontractor who made a claim against the payment bond." *Goodbys,* 2008 WL 2950112, at *2 (emphasis added).

Second, the New York Court of Appeals recently concluded that a subcontractor who is otherwise entitled to recover under a statutory payment bond may lawfully assign its rights under that bond to a third party, who may then collect directly from the surety. The New York Court of Appeals, observing that § 137 is "silent ... on who may sue on [a statutory payment] bond," nevertheless held that § 137 "allows subcontractors' assignees to recover payment from bond sureties." *Quantum,* 4 N.Y.3d at 214, 791 N.Y.S.2d 876, 825 N.E.2d 117. The Court of Appeals thereby rejected the theory that § 137, by identifying a specific class of beneficiaries, had intended that the interests of those class members be non-transferrable. *Id.* at 217, 791 N.Y.S.2d 876, 825 N.E.2d 117. The court noted it was "comforted in this conclusion by the continued successful functioning of public works and the surety market in those jurisdictions that have maintained long-standing rules allowing for [payment bond claim] assignments." *Id.* at 218 n. 5, 791 N.Y.S.2d 876, 825 N.E.2d 117; *see also* 3 Bruner & O'Connor on Construction Law § 8:177 (discussing assignment of payment bond rights).

Third, a recent New York case litigated before Suffolk County Supreme Court and the Second Department suggests that New York law is amenable to a subrogation-based recovery in circumstances comparable to those at issue here, even though that case denied recovery to the owner-obligee. In *Broadway,* the owner-obligee—who had already made all required payments to its prime contractor—also made certain additional payments to the prime contractor's subcontractors. *See Broadway,* 22 Misc.3d 1001, 870 N.Y.S.2d 748 (Sup.Ct. Suffolk County 2008) (trial court decision); *Broadway,* 897 N.Y.S.2d 505 (appellate decision). The owner-obligee then sued the surety to recover those payments, contending that the surety should have compensat-

ed the unpaid subcontractors under the payment bond in the first instance. The trial court concluded on the facts of that case that the owner-obligee was not actually "under a legal compulsion to pay the subcontractors to avoid mechanics' liens" and thus, that the owner-obligee did not have standing under the doctrine of equitable subrogation. 870 N.Y.S.2d at 754, 756. Among other things, while the subcontractors had threatened to file mechanics' liens, they had not yet done so. *Id.* at 750–51. On appeal, the Appellate Division upheld the Supreme Court's reasoning, ruling that "the party seeking subrogation must show that the act is not merely helpful but necessary to the protection of its interests." *Broadway,* 897 N.Y.S.2d at 506. In rendering their decisions, neither court suggested the existence of any *per se* bar to recovery by the owner-obligee based merely on the fact that it was the obligee of the payment bond. *See also Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.,* 64 A.D.3d 85, 878 N.Y.S.2d 97, 112 (2d Dep't 2009) ("*Hamlet* ") (permitting recovery based on "novel" argument by a putative subrogee to the rights of a performance bond obligee against both the principal and surety).

Finally, allowing the owner-obligee in the appropriate circumstances to recover under an equitable subrogation theory against a payment bond surety would support one of the purposes of State Finance Law § 137, namely, " 'protect[ing] the equity of the owner in his property against the claims of unpaid creditors.' " *Braspetro,* 369 F.3d at 69 (quoting *HNC Realty Co.,* 409 N.Y.S.2d at 779). Indeed, the rationale underlying the decision of the New York Court of Appeals in *Quantum,* in which the court permitted assignment of payment bond claims on the basis that such a result would serve the statutory purpose of § 137, applies *a fortiori* where

it is the owner-obligee, rather than a third-party factoring company, seeking to enforce the terms of the payment bond.[81]

### 4. Application

■ Given the foregoing conclusions of law, DASNY's status as "obligee" under the Payment Bond does not, in itself, prevent DASNY from recovering from Travelers for the latter's alleged breaches of the Payment Bond. Instead, the relevant inquiry is whether DASNY can successfully show that it has satisfied the criteria for equitable subrogation.[82] The doctrine of equitable subrogation

> is broad enough to include every instance in which one party pays a debt for which another is primarily answerable and which in equity and good con-

science should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability.

*Hamlet,* 878 N.Y.S.2d at 105–06 (quoting *Gerseta Corp.,* 241 N.Y. at 425–26, 150 N.E. 501); *see also Broadway,* 897 N.Y.S.2d at 506.[83]

■ Applying the foregoing principles to this case, Travelers has failed to carry its burden of demonstrating as a matter of law that DASNY is precluded from recovering under the Payment Bonds. Although Travelers asserts that "any alleged payments from DASNY directly to Trataros' subcontractors or suppliers were made as a volunteer," [84] it has not submitted

---

**81.** In seeking summary judgment, Travelers argues that "if DASNY intended to assert a claim against Travelers relating to Trataros' purported failures to pay its subcontractors, its proper remedy was to declare Trataros in default of its contracts and bring a claim under the performance bonds" (emphasis omitted). Although this argument appears intuitive, it ignores the fact that performance bonds and payment bonds protect against different risks. Because a contractor might fully perform on its contract with the owner, while simultaneously failing to pay its subcontractors, it does not necessarily follow that an owner could seek redress under a performance bond for the contractor's failure to pay its subcontractors. Indeed, Travelers has not tendered evidence that DASNY would have been able to recover its subcontractor-payment losses this way.

**82.** DASNY asserts that its right to recovery against Travelers on the Payment Bond Claim is based on "[its] ability to subrogate the rights of Trataros' subcontractors under the Payment Bonds."

**83.** Although here the doctrine of equitable subrogation is being used to assert claims *against* a payment bond surety, more commonly, subrogation is used by a surety. *See, e.g., RLI Ins. Co. v. N.Y. State Dep't of Labor,* 97 N.Y.2d 256, 264–65, 740 N.Y.S.2d 272,

766 N.E.2d 934 (2002) (discussing surety's ability to subrogate to the rights of the subcontractors whom it compensates under a payment bond).

**84.** The cases Travelers relies on to support this proposition are inapposite. *See Chi. Title Ins. Co. v. Eynard,* 84 Misc.2d 605, 377 N.Y.S.2d 895, 896–97 (App. Term 1st Dep't 1975) (buyer's title insurance company could not recover against the seller the costs of paying off a federal tax lien on seller's former property, because the seller's quitclaim deed contained no warranties and thus, seller was not liable for the amount of the lien); *Auto Dealers' Discount Corp. v. Budd,* 242 A.D. 37, 272 N.Y.S. 893, 894 (4th Dep't 1934) (per curiam) (plaintiff that voluntarily paid automobile storage charges incurred by the f could not invoke subrogation to recover against the sheriff). Likewise, Travelers' reliance on *Novak & Co., Inc. v. Travelers Indemnity Co.* for the proposition that, in Travelers' words, "attempts to expand the scope of a surety's payment bond to purported third-party beneficiaries have been rejected by New York courts" is misplaced. *See Novak & Co., Inc.,* 56 A.D.2d 418, 392 N.Y.S.2d 901, 903–06 (2d Dep't 1977) (considering the viability of third-party beneficiary claims under surety bonds). "Third-party beneficiary" and "equitable subrogee" are distinct legal statuses requiring different factual proofs. Finally,

evidence to establish that fact. In contrast, DASNY has tendered evidence showing that several subcontractors filed notices of mechanics' liens on the Project;[85] that those subcontractors subsequently initiated various lawsuits against DASNY in New York state court to foreclose on those liens; and that DASNY was ordered by the court to participate in a settlement process in an effort to resolve all outstanding subcontractor payment claims. DASNY has submitted the complaints from three of those actions with its summary judgment materials.[86] *See LBL Skysystems Corp. v. Trataros Constr., Inc.,* Index No. 21024–2003 (Sup.Ct. Kings County); *Universal Servs. Grp., Ltd. v. Trataros Constr., Inc.,* Index No. 111651–2003 (Sup.Ct.N.Y.County). Accordingly, because DASNY may be able to recover damages on its Payment Bond Claim under an equitable subrogation theory, and because Travelers has not demonstrated that such a theory is clearly untenable on these facts, Travelers' motion for summary judgment as to this claim is denied.

## CONCLUSION

Travelers' February 19, 2010 motion for summary judgment is granted in party. The Breach–of–Contract Counterclaim and Performance Bond Counterclaim are both dismissed, while the Payment Bond Counterclaim survives. DASNY's February 19, 2010 motion for summary judgment is granted in its entirety. A separate scheduling Order accompanies this Opinion.

SO ORDERED:

---

Travelers cites law for the proposition that a party which settles before trial cannot later seek contribution from another party. *See Merchants Bank of N.Y. v. Credit Suisse Bank,* 585 F.Supp. 304, 310 (S.D.N.Y.1984). DASNY is not, however, claiming contribution, but rather seeking to vindicate, as equitable subrogee, the subcontractors' Payment Bond rights.

85. DASNY's and Travelers' summary judgment materials include, *inter alia,* notices of two mechanics' liens filed by LBL, each dated June 6, 2002, in the amounts of $1,029,531.58 and $158,953.87; a notice of mechanics' lien filed by Universal Services Group, Ltd. dated October 8, 2002 in the amount of $128,700.00; and a notice of mechanics' lien filed by R & J Construction Corp. dated November 18, 2002 in the amount of $2,397,163.00.

86. The referenced LBL action could not be located in the state court records. LBL did, however, also file a lawsuit in New York County against DASNY, Trataros, and others in 2004. *See LBL Skysystems Corp. v. Trataros Constr., Inc.,* Index No. 401484–2004 (Sup.Ct.N.Y.County).